**In re Maria T. CUETO and Raisa Nemikin, Contemnors.**

No. M–11–188.

United States District Court, S. D. New York.

Jan. 23, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, by Thomas E. Engel, Marc Marmaro, Asst. U. S. Attys., New York City, of counsel, for the U. S.

Fink & Meyers, New York City, by Elizabeth M. Fink, Margaret L. Ratner, New York City, of counsel, for contemnors.

Cahill, Gordon & Reindel, New York City, by Eugene R. Scheiman, New York City, of counsel, for National Council of Churches of Christ in the U. S.

Patterson, Belknap, Webb & Tyler, New York City, by Robert S. Potter, New York City, of counsel, for intervenors.

## OPINION

ROBERT L. CARTER, District Judge.

*The Issue Raised*

Movants, Maria Cueto and Raisa Nemikin, were cited for civil contempt under 28 U.S.C. § 1826(a) for refusing to answer certain questions before a grand jury investigating the terrorist bombing activities of an organization called Fuerzas Armadas de Liberacion Nacional Puertorriquena ("FALN"). Pursuant to their contempt adjudications, they were ordered confined during the life of the grand jury or until they agreed to testify, and both have been held in confinement at the Metropolitan Correctional Center—Nemikin since March 1, and Cueto since March 8, 1977. The grand jury term expires on May 9, 1978.

Movants claim that their refusal to testify before the grand jury, being based upon moral and religious commitments, is irrevocable. Accordingly, they urge that since they will not betray their religious convictions by giving testimony, their incarceration has had and can have no coercive effect, and that their continued incarceration clearly has become punitive. Therefore, movants contend that the due process guarantees of the federal constitution mandate their release in that their continued confinement bears no reasonable relationship to the purposes for which they were committed.

*Prior Proceedings*

A clearer understanding of the narrow issue raised in this motion requires a somewhat more detailed recapitulation of the history of this litigation than ordinarily would be warranted.

Cueto has been actively involved in the work of the Episcopal Church since 1966, and her activities have been concentrated largely on issues and programs affecting the Hispanic Community. She became a member of the National Commission on Hispanic Affairs ("Commission") which was organized as an arm of the Episcopal Church to aid the Church in performing its mission of helping to provide opportunities for improving the socio-economic status of the Hispanic Community in the United States. Cueto became a director of the Commission in 1972 and held that position at the time when the events which led to her present incarceration transpired.

Nemikin has been secretary to the Commission since 1972 and held that position when she refused to give testimony before the grand jury.

In 1974–75, a series of bombings occurred at a number of buildings in New York City where banks and corporate offices were housed. FALN claimed responsibility for these terrorist acts. A grand jury investigation of the bombings and FALN's relationship to them was initiated, and on November 9, 1976, a new grand jury was organized to continue the investigation. In

due course, subpoenas were issued calling for the production of certain records of the Commission.

Movants were questioned by the FBI concerning Carlos Torres, a member of the Commission whom the FBI was trying to locate and question since the government had reason to believe that Torres was implicated in the planning and/or execution of the bombings. Thereafter, subpoenas were issued calling for movants to appear before the grand jury to testify. Movants sought to quash the subpoenas, but Judge Pierce denied that motion on February 4. *See In re Wood*, 430 F.Supp. 41 (S.D.N.Y.1977) (Pierce, J.).

Nemikin appeared before the grand jury on February 18, 1977, and was asked and refused to answer the following questions: When did you last speak to or otherwise communicate with Carlos Torres? Identify all funds of the Commission which were directed, openly or in secret, in whole or in part, to FALN or to any FALN member? Identify to the grand jury any person you know who was involved in or claimed responsibility for the dynamite bombing of Fraunces Tavern on January 24, 1975, resulting in the death of four persons?[1]

Cueto appeared before the grand jury on March 4 and refused to answer the following questions: Do you know anything about the whereabouts of Carlos Torres? Did Torres play any part in the bombing of Fraunces Tavern in New York on January 24, 1975? This grand jury is trying to find out, among other things, who is responsible for the bombing of Fraunces Tavern that killed four people. Can you tell us the names of any person who participated in the bombing or do you have any information at all with respect to it?[2]

Movants were taken before Judge Frankel of this court who advised them that they had no recognizable right to refuse to answer the questions put to them before the grand jury. Each persisted in her refusal, and each was adjudged in contempt by

Judge Frankel—Nemikin on February 26 and Cueto on March 4. Each was ordered incarcerated for the life of the grand jury or until they agreed to testify pursuant to 28 U.S.C. § 1826(a), which provides:

Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of confinement shall exceed the life of—

(1) the court proceeding, or

(2) the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, but in no event shall the confinement exceed eighteen months.

Judge Frankel's adjudication of contempt was affirmed on appeal. *In re Cueto*, 554 F.2d 14 (2d Cir. 1977). Thereafter, on or about May 20, 1977, movants, making substantially the same argument being made here, sought relief before Judge Stewart of this court from incarceration or, in the alternative, for an order fixing their incarceration to a certain and definite term. Judge Stewart denied their motion as being premature, insofar as it asserted that their confinement no longer served a coercive function, in view of the short length of their incarceration—at the time, slightly in excess of 60 days.

*Movants' Contentions*

Movants urge here that their refusal to testify is grounded in firmly held religious beliefs, and that their work with the Commission was a part of the mission of the Episcopal Church of the United States to

1. The questions as listed above constitute the substance of those asked. They are not set out verbatim.

2. Again, the questions are not set out verbatim.

millions of Spanish speaking people who have experienced a history of denial of basic human rights in this country. Movants claim that their function as lay ministers in the Church would be impaired if they testified, and they assert, in effect, that since they will never testify, the coercive objective of their confinement will not be realized and their continued confinement can only be punitive.

Movants' recalcitrance is supported by the Bishop and other dignitaries of the Episcopal Church of Puerto Rico, by the National Council of the Churches of Christ in the United States ("National Council"), by the Bishop of the Episcopal Diocese of New York and by the Resigned Bishop of the Episcopal Diocese of Pennsylvania, as well as by other less eminent persons and bodies in the Church. The National Council and the various Bishops referred to have been allowed to appear as amici curiae. All assert that movants' defiance of the court's order to provide information to the grand jury is an exercise of the First Amendment right of freedom of religion, the matrix of religious and individual liberty in an open society. Amici also assert, although movants do not, that Cueto and Nemikin have no knowledge of FALN or of the bombings. While the Episcopal Church of the United States, under whose auspices the Commission was organized and functions, did not appear as amicus curiae, the government, in an exemplary demonstration of prosecutorial candor, advises that the Presiding Bishop of that body has met repeatedly with responsible government officials seeking movants' release. Thus, for whatever it is worth, a sizable segment of the officialdom of the Episcopal Church holds and has articulated a concern that tenets of religious freedom which are protected by the Constitution are being infringed by the government's insistence that these two women be required to respond to the grand jury inquiry, and movants' continued incarceration is viewed as wrongful governmental persecution.

While it is difficult for me to understand how that position can be seriously advanced by amici curiae in light of the particularly innocuous questions put to Cueto and Nemikin before the grand jury, I need not face the religious issue frontally since Judge Pierce has conclusively demonstrated that no violations of the First Amendment's guarantee of religious freedom are even remotely involved in this case. Although movants concede that that issue is foreclosed, they argue that the fact that movants believe themselves compelled to continue in their stance of defiance because of their religious convictions and commitments—a position, as I have indicated, that is supported by a not insignificant segment of their Church's hierarchy—provides an articulated moral basis for their recalcitrance.

## Discussion

■ Cueto's and Nemikin's posture is surely wrongheaded and without support in law, but I accept what I conceive to be the real point of the argument, that is, that movants are acting in good faith. Good faith, however, may not justify refusal to perform a legal obligation. *See United States v. Mine Workers*, 330 U.S. 258, 306–07, 67 S.Ct. 677, 91 L.Ed. 884 (1947), and the fact that their action, though misguided, is taken in good faith, is, as is often the case in real life, irrelevant.

As a threshold consideration, it must be remembered that movants have been held to be in civil contempt pursuant to 28 U.S.C. § 1826—a statute which, in 1970, codified a long standing civil contempt practice in the federal courts with respect to recalcitrant witnesses before a court or grand jury. *See* 1970 U.S.Code Cong. and Admin.News p. 4022; *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *In re Grand Jury Investigation (Sam Giancana)*, 352 F.2d 921 (7th Cir.), *cert. denied*, 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362 (1965). The limitation in the statute on the power of a federal judge to sentence the contemnor to incarceration for no longer than the life of the grand jury and, in no event, to a period greater than 18 months was a legislative acceptance of the restraint imposed by the United States Supreme Court. *See Shillitani v. United*

*States, supra*; 1970 U.S.Code Cong. and Admin.News p. 4008.

We deal, therefore, with a judicial determination and practice expressly adopted and codified as legislative policy by the Congress. Under these circumstances, movants' situation cannot be equated or compared with open-ended and indeterminate incarceration for civil contempt which is possible under state law and practice, based on a doctrine of inherent judicial authority and not adopted and codified, as here, as legislative policy as well. Moreover, the developments in the cases on which movants rely have come about to supply a termination point to potentially life-long confinement pursuant to summary court proceedings and without a trial by jury.

For this reason, I believe that reliance on *McNeil v. Director, Patuxent Institution*, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Catena v. Seidl*, 65 N.J. 257, 321 A.2d 225 (1974), or *In re Farr*, 36 Cal.App.3d 577, 111 Cal.Rptr. 649 (1974) is misplaced. Moreover, for different considerations, the determinations in *In re Grumbles*, Cr. No. 722–71 (D.N.J. Feb. 22, 1973), and *In re the Special February 1975 Grand Jury*, No. 76 GJ 1128 (N.D.Ill. Jan. 6, 1978), do not advance movants' cause.

In *Jackson v. Indiana, supra*, petitioner, a deaf mute, had been charged in 1968 with the separate robberies of two women (total value of the stolen property involved was $9.00). After a competency hearing, the petitioner was found by the state court to lack sufficient comprehension to be able to stand trial and was committed to the Indiana Department of Mental Health until that agency should certify him as sane. The Court held that a person who is charged with a criminal offense and is committed solely by reason of an incapacity to stand trial cannot be held in custody for more than a reasonable time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is found

that no such substantial probability exists, the state must institute normal civil proceedings required for indefinite commitment of the mentally incompetent or grant immediate release. "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. at 738, 92 S.Ct. at 1858.

In *McNeil v. Director, Patuxent Institution, supra*, the petitioner had been sentenced by a Maryland court to five years imprisonment. The trial court, thereafter, had committed petitioner to a state institution as a defective delinquent for observation for an indeterminate period. The period of observation had extended to six years by the time the case reached the Supreme Court—one year beyond the sentence imposed for the crime charged. The Court ordered petitioner's release, holding that due process considerations require that the nature and duration of incarceration must be reasonably related to the purpose the commitment is designed to serve.

Those cases are not controlling here. We are not dealing with a situation in which a judge imposes an open-ended sentence pursuant to which the incarceration could continue for all of the individual's life. Summary proceedings which result in sentences of potential life duration shock the conscience, and thus are regarded as an aberration in an open society committed to the rule of law, grounded in reason and fairness.

Similarly, the state cases, although relevant since they support and enunciate the legal thesis movants advance here, are inapposite. In the case at bar, unlike the state cases, there is no possibility of an open-ended, indeterminate or long term incarceration in that movants' confinement, when imposed, had to terminate on May 9, 1978.

In *In re Farr, supra*, a newspaper reporter, who had published information which counsel had been ordered not to make public and who refused to reveal to the trial court the source from which the forbidden data had been obtained, was adjudged in

civil contempt and ordered incarcerated until he revealed the identities of the persons who had supplied him with the prohibited matter. The California Court of Appeals held that coercive incarceration to compel compliance with a court order "presents a special problem when disobedience . . . is based upon an established articulated moral principle." 36 Cal.App. at 584, 111 Cal.Rptr. at 653. In such a situation, the court held, it becomes "necessary to determine the point at which commitment ceases to serve its coercive function and becomes punitive in character." *Ibid.* When incarceration of the contemnor becomes penal, the length of the incarceration under California law must terminate in five days. *Ibid.* The court held that in a proper proceeding "a determination may be made whether petitioner's continued incarceration will accomplish the purpose of the order requiring that he reveal the identity of the persons who had violated the trial court's order . . . . The ultimate fact to be determined by the trial court is ·the presence or absence of a substantial likelihood that petitioner's continued commitment will serve that purpose . . . ." 36 Cal.App. at 584, 111 Cal.Rptr. at 653–54.

Similarly, in *Catena v. Seidl, supra,* the State Commission of Investigation called Girado Catena, "a suspected member of the hierarchy of organized crime," to testify before it. 321 A.2d at 227. Catena appeared but refused to answer some 80 questions put to him. He was cited for civil contempt on March 4, 1970, by the New Jersey Superior Court and was incarcerated until such time as he would give the sought testimony. His various appeals failed, and on January 4, 1974, he applied to the trial court for release. The trial court, taking into account his age (72), his poor health and deteriorating physical condition, the length of his confinement, the substantial likelihood that his continued confinement would not result in his testifying before the State Commission and, therefore, that his confinement would possibly continue for the life of the Commission whose term had been extended to December 31, 1979, ordered his release on the grounds that his

continued incarceration could no longer be deemed coercive. The New Jersey Supreme Court accepted the trial court's formulation as the proper test but held that its application did not warrant Catena's release at that time. 321 A.2d at 229.

When the case reached the New Jersey Supreme Court again a year later, however, the majority agreed that the test as then applied to the facts mandated Catena's release. *Catena v. Seidl,* 68 N.J. 224, 343 A.2d 744 (1975) ("Catena II").

Again, the rationale of this case is to terminate a confinement which could conceivably keep a contemnor incarcerated for many years. While accepting the humane and equitable principles underlying the test adopted by the California and New Jersey courts, I agree with the dissent in *Catena II* that what the two courts have done is to "substitute [the contemnor's] dogma for the law duly adopted by society." 343 A.2d at 748.

That seems to me to be a fatal weakness of the principle. Here we are being asked to accept movant's view that to force them to give what seems to be innocuous-enough testimony is to require them to breach their religious vows, when as Judge Pierce's decision makes clear, there are in actuality no religious principles at stake. Perhaps all that is being articulated and acted upon by the contemnors is. a commonplace view among the "outs" in a social system—here the Hispanic poor among whom movants work—that one is being a traitor to one's group if she cooperates with law enforcement officials.

■ Movants may well continue in the erroneous belief that they are acting from religious conviction protected by the Constitution, particularly since they are being supported by some segments of their Church, and indeed may continue to refuse throughout the term of the grand jury to testify. Experience does indicate, however, that threats to refuse to testify are not always acted upon when the threats themselves fail. *See United States v. Sanchez,* 459 F.2d 100, 103 (2d Cir. 1972). In any

event, the fact of their possible continued recalcitrance is an insufficient basis to justify release when they are facing incarceration only until a specific termination date, May 9, 1978.

There are two federal cases on which movants rely as applying the theory of law they urge be applied in this case. Those cases are *In re Grumbles*, Cr. 722–71 (D.N.J. 1973), and *In re The Special February 1975 Grand Jury*, No. 76 GJ 1128 (N.D.Ill. Jan. 6, 1978). In the *Grumbles* case, Judge Williamson, who had ordered the incarceration for contempt, concluded that with only one month to go before the expiration of the grand jury "the order of the Court in holding these people in contempt has been brought forth to Patricia Grumbles and Donald Grumbles in no uncertain terms. I feel, however, now and at this point that the incarceration" has become punitive. *In re Grumbles, supra*, Transcript at 25. Accordingly, he ordered their release.

The Illinois case is less clear. One of the contemnors, Pedro Archuleta, had been adjudged in civil contempt by this court, as well as by the district court in Illinois. Archuleta had been confined under the order of the latter court since July 27, 1977. At a January 6, 1978 hearing Archuleta was asked whether he would change his mind and testify. Archuleta responded in the negative. Judge Parsons stated that he was satisfied that Archuleta would not change his mind, that the latter was sincere in his dedication to the cause he believed he served and ordered his release. The other parties who had been confined for shorter periods were not released.

While Judge Williamson and Judge Parsons paid at least lip service to movants' thesis, their action can be rationalized on a considerably firmer legal foundation. A district judge has wide latitude in a civil contempt situation in determining whether to order coercive incarceration at all, and if incarceration is deemed warranted, the length of incarceration imposed is within his sound discretion as long as it does not extend beyond the grand jury term. *See In re Buonacoure*, 412 F.Supp. 904, 907 (E.D.Pa.1976). In the absence of abuse of discretion, the judgment will not be disturbed on appeal. *Cf. Keyes v. United States*, 314 F.2d 123 (9th Cir. 1963). A "contempt citation is a matter in [the] discretion of the judge who gives it . . .." *United States v. Reide*, 494 F.2d 644, 647 (2d Cir. 1974). Having ordered coercive incarceration for a certain period, surely the judge may in his discretion modify his judgment, based upon whatever rational considerations appeal to him, including ordering that the coercive incarceration be terminated short of the time originally fixed without the contemnor having complied with the court's order. As I see it, it is the exercise of that discretion afforded the district judges that is involved in the above cited federal cases. In sum, I find no support for the application of the legal theory which movants urge in any situation in which a civil contempt citation has been made pursuant to Section 1826.

That does not end the matter, however. In most other jurisdictions movants could apply to the judge who cited them for contempt for a modification of the court's original judgment. Our court, however, pursuant to Rule 6 of our local Assignment and Calendar Rules, refers all matters relating to the grand jury to the Part I Judge. Rule 6 does not explicitly state that all matters relating to proceedings before the grand jury shall be heard by the Part I Judge, as is true in respect of Rule 5 of the Calendar Rules of the Eastern District,[3] but through practice and usage Rule 6 has been so interpreted, or at least it has been so construed by the members of the court involved in the history of these Cueto-Nemikin proceedings.

Movants have appeared before at least five different judges of this court (Judges MacMahon, Pierce, Frankel, Stewart and now myself) because they raised an issue or made application at the time when the particular judge was on his tour of duty in

---

**3.** The reference in Rule 5 of the Calendar Rules of the Eastern District is to the Miscellaneous

Part Judge, but it seems clear that this would be the Part I Judge in this court.

Part I. While each of the preceding judges could have, if he wished, taken the case as his own and maintained jurisdiction over it, none chose to do so.[4] After Judge Frankel cited movants for contempt, movants made their first application for release on May 12 to Judge Frankel. Judge Frankel advised them that the matter should be referred to Judge Stewart, then the Part I Judge (Aff. Elizabeth Fink dated January 16, 1978).

■ There surely exists in this court the power to mitigate and lessen coercive incarceration once imposed. Our rules and practice would appear to consign that authority to the Part I Judge. Accordingly, as the Part I Judge to whom the matter was referred and before whom the matter has been *sub judice*, I must determine—apart from movants' rejected legal thesis— whether other considerations warrant movants' release from further coercive incarceration.

Movants are clearly misguided in their continued refusal to adhere to their legal obligation to testify before the grand jury since their defiance cannot be justified under any recognized or accepted First Amendment ground. *See In re Wood, supra*. However, movants have now been held in coercive custody for more than 10 months. There has been no showing or indication in any of the papers presented to me that these women are other than what they appear to be—persons legitimately engaged in the work of their Church. There has been no showing that they are themselves involved in criminal activities or engaged in crime. There has been no indication that they belong to FALN, or condone or espouse its terrorists' views. All that has been shown is that one Carlos Torres was a one time member of the Commission and movants may have talked to him and may have had some knowledge as to his whereabouts.

In respect of the latter knowledge, however, it is clear that whatever they might have known about Torres' whereabouts last February and March has now become stale information and is unlikely to advance the grand jury investigation. Information as to whether funds of the Commission ever found their way to FALN can surely be ascertained, and more accurately, from other sources. Indeed, it seems unlikely that the Episcopal Church would allow one of its agencies to be corrupted away from its true mission of helping uplift and service the poor, to give financial assistance to murderers and terrorists. The Episcopal Church hierarchy continues to accept both these women as proper church officials duly engaged in the work of the Church. Under these circumstances it does not appear to me that any legitimate purpose is being furthered in keeping the women in custody. The sanctity of the law has been duly vindicated in a coercive incarceration of some ten months duration. Humane considerations require their release.

My preference, of course, would have been for movants to seek their release from Judge Frankel,[5] who originally cited them

---

4. Again, our rules are not explicit in respect of matters relating to the grand jury, but Rule 6(B)(2) provides for such transfer for all further proceedings in civil emergency matters. By analogy, a Part I Judge who is presented with a matter arising out of a grand jury proceeding has the power to retain jurisdiction over that matter.

5. The practice of these matters being referred to successive Part I Judges is not uniformly followed in this court. Pedro Archuleta, who was released from coercive incarceration in Illinois, *see ante*, has been returned to this jurisdiction. He had been cited for civil contempt by Judge Owen of this court and ordered into coercive custody for the life of the grand jury or until he agrees to testify. On his release from confinement in Illinois and his return to this district, Archuleta applied for a modification of the contempt order. The matter was scheduled for hearing on Friday, January 20 before Judge Motley, the current Part I Judge. However, Judge Owen and she have now agreed that the matter should properly be referred to Judge Owen and Judge Owen has taken on the motion.

Thus some members of the court interpret Rule 6 as indicated in the text and at least two of our members regard the judge who issued the original citation as having continuing jurisdiction to handle further proceedings in relation thereto. The view taken by Judges Motley and Owen would appear to be preferred simply because it avoids the awkwardness of a second judge amending a judgment the first judge en-

for contempt, because I do not wish to be placed in a position of appearing even *sub silentio* to be critical of the adjudication Judge Frankel made. Indeed, I am satisfied that my conclusions are no different than those Judge Frankel would reach if faced with this problem at this time. At any rate, it does not appear to me that coercive incarceration beyond six months duration is justified in situations of this kind. Since that period has long passed, movants are ordered released from coercive confinement. The court will exercise authority granted under Rule 6 of our local rules and retain jurisdiction of this case for any future proceedings. *See* note 4, *supra.*

IT IS SO ORDERED.

tered. At any rate, it is clear that the matter will have to be settled by the enactment of a more explicit rule or guideline. Disposition of the matter, however, cannot and should not be delayed to await final settlement of this interpretive variance among members of the court.