In re GRAND JURY INVESTIGATION.

Appeal of Joseph BRAUN, Witness.

No. 79–1520.

United States Court of Appeals, Third Circuit.

Argued May 3, 1979.
Decided June 6, 1979.

Daniel J. DiGiacomo, Joel Harvey Slomsky (Argued), Philadelphia, Pa., for appellant.

Peter F. Vaira, U. S. Atty., Philadelphia, Pa., Joel M. Friedman, Robert E. Madden, Jerome M. Feit, Sara B. Criscitelli, (Argued), U. S. Dept. of Justice, Washington, D. C., for appellee.

Before ADAMS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal we must decide whether appellant's confinement for civil contempt pursuant to 28 U.S.C. § 1826(a) exceeds the period of time permissible under the due process clause, and whether an evidentiary hearing must be held before a decision is made not to terminate his confinement prior to the time set forth in the statute.

### I.

A federal grand jury was empanelled on February 28, 1978, in the United States District Court for the Eastern District of Pennsylvania to investigate a number of alleged federal violations, including loan-sharking, mail fraud, obstruction of justice, and interstate transportation of stolen property. Seeking the cooperation of the appellant, Joseph Braun, who was one of the targets of the investigation, government agents approached Braun at Allenwood prison in May, 1978, where he was incarcerated under a two-year sentence. That sentence, which Braun began serving on January 10, 1978, stemmed from the operation by Braun of a check cashing agency at which embezzled private and government checks had been cashed.[1] Fol-

---

1. Braun was convicted on February 3, 1977, of one count of engaging in racketeering and collecting an unlawful debt in violation of 18 U.S.C. § 1962(c), one count of conspiring to engage in such activity in violation of 18 U.S.C. § 1962(d), and twenty-nine counts of uttering

lowing the pattern that he had set throughout his own prosecution, Braun declined to cooperate with the government.

In August, 1978, the federal prosecutor obtained a writ of habeas corpus *ad testificandum* for the purpose of securing Braun's testimony before the grand jury. Braun was brought to the courthouse, but refused to answer any questions. He was then granted immunity by the district judge, yet persisted in declining to testify. For this refusal he was held in civil contempt of court on September 29, 1978.

Adhering to the time limits specified in 28 U.S.C. § 1826(a),[2] the district court ordered that Braun be confined until such time as he was willing to testify before the grand jury, but not longer than the term of that grand jury, including extensions, and in no event in excess of eighteen months. In addition, the district judge directed that the running of time on the two-year sentence that had previously been imposed be suspended for the duration of the confinement under the contempt order.[3]

Braun moved on December 22, 1978, to terminate the order of confinement for civil contempt. In his motion, Braun contended that inasmuch as there was no substantial likelihood that he would testify before the grand jury, his continued incarceration no longer bore a reasonable relationship to the purpose for which he was committed—namely, to obtain his testimony—and therefore it violated due process. That there is no substantial likelihood that he will testify is evident, Braun argued, from his refusal to cooperate with the government over a two and one-half year period because of his fear for his and his family's safety.[4] Braun ended his motion with a request for an evidentiary hearing at which he would seek to establish that there is no substantial likelihood that he would be coerced by the contempt order.

The district court, on January 3, 1979, denied Braun's motion without affording him a hearing, and subsequently, on February 26, 1979, dismissed a petition for reconsideration. A notice of appeal was timely filed.

## II.

■ Embedded in Anglo-American law is the inherent power of the judiciary to coerce obedience to its orders by summarily holding a recalcitrant person—such as an immunized witness who refuses to testify at a grand jury proceeding or at a trial—in civil contempt, and then imprisoning him until he complies.[5] In contrast to criminal contempt, whose purpose it is to punish acts that are contumacious and disrespectful of

forged United States Treasury checks in violation of 18 U.S.C. § 495. His conviction was affirmed by a judgment order of this Court, No. 77–1457 (October 5, 1977).

2. 28 U.S.C. § 1826(a) (1976) provides:

Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

(1) the court proceeding, or

(2) the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

3. This is a practice previously approved by this Court. *See Bruno v. Greenlee*, 569 F.2d 775 (3d Cir. 1978) (per curiam); *In re Grand Jury Investigation (Hartzell)*, 542 F.2d 166 (3d Cir. 1976), *cert. denied*, 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed.2d 762 (1977).

4. The government responded to Braun's fear by offering to place Braun under the Witness Protection Program. However, Braun asserts that this solution would not protect his family, which includes 27 grandchildren, from possible retribution.

5. *See, e. g., Shillitani v. United States*, 384 U.S. 364, 370–71, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *United States v. United Mine Workers*, 330 U.S. 258, 330–32, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (Black and Douglas, JJ., concurring in part and dissenting in part). *See generally* Goldfarb, The Contempt Power (1963).

the court and thereby to vindicate the authority of the court, civil contempt is primarily coercive in nature, and is designed to benefit a party that has complained to the court about the contemnor's recalcitrance.[6]

 The basis for permitting a court summarily to order coercive imprisonment for recalcitrant individuals without affording them the safeguards of a criminal proceeding[7] is that the contemnors hold "the keys of their prison in their own pockets"[8] and therefore may purge themselves of civil contempt at any time. This rationale, however, delimits the permissible scope of such a sanction. Since it is impossible to succeed in coercing that which is beyond a person's power to perform, continued incarceration for civil contempt "depends upon the ability of the contemnor to comply with the court's order. *Maggio v. Zeitz*, 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948)."[9] Thus, with respect to a witness who is held in civil contempt for refusing to testify before a grand jury, the Supreme Court has declared in *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), that "[w]here the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt. . . . Once the grand jury ceases to function, the rationale for civil contempt vanishes, and the contemnor has to be released."[10]

In recent years a number of courts, when presented with situations involving indeterminate periods of confinement for civil contempt, have spoken of an additional constraint upon the civil contempt power.[11] Because the contemnor's imprisonment is said to be justified as a coercive measure, these courts have declared that when the confinement has lost its coercive force it essentially becomes punitive, and the contemnor must then be released since it is

6. See, e.g., *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441–42, 31 S.Ct. 492, 55 L.Ed. 797 (1911), where it is recognized that no bright line can be drawn between civil and criminal contempt: civil contempt may have an incidental punitive effect and, likewise, criminal contempt may result in an incidental benefit to the complainant. *See also Latrobe Steel Co. v. United Steelworkers of America, AFL–CIO*, 545 F.2d 1336, 1343–44 (3d Cir. 1976). In *Latrobe*, a second category of civil contempt, whose purpose it is to compensate the complainant for past acts of disobedience, is mentioned. On the distinctions between civil and criminal contempt, *see generally* 3 C. Wright, Federal Practice and Procedure § 704 (1969); Note, *The Coercive Function of Civil Contempt*, 33 U.Chi.L.Rev. 120 (1965).

7. Civil contempt proceedings may be instituted without an indictment and conducted without a jury, *see Shillitani, supra*, 384 U.S. at 371, 86 S.Ct. 1531. In federal courts in this as well as in other circuits, however, civil contempt proceedings must comply with the procedures set forth in Fed.R.Crim.P. 42(b), *see In re Grand Jury Investigation (Bruno)*, 545 F.2d 385 (3d Cir. 1976).

8. *In re Nevitt*, 117 F. 448, 461 (8th Cir. 1902).

9. *Shillitani, supra*, 384 U.S. at 371, 86 S.Ct. at 1536.

10. 384 U.S. at 371–72, 86 S.Ct. at 1536. Rather than rest this limitation on· considerations of due process, the Supreme Court regarded it as emanating from "the doctrine that a court must exercise '[t]he least possible power adequate to the end proposed.' *Anderson v. Dunn*, 6 Wheat. 204, 231, 5 L.Ed. 242 (1821); *In re Michael*, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30 (1945)." *Id.* at 371, 86 S.Ct. at 1536. In *In re Michael, supra*, the Court discerned a congressional intent that this doctrine bind courts in the exercise of their contempt power in order that the procedural safeguards of the Bill of Rights be preserved.

11. *E. g., Lambert v. State of Montana*, 545 F.2d 87 (9th Cir. 1976); *In re Farr*, 36 Cal.App.3d 577, 111 Cal.Rptr. 649 (1974); *Catena v. Seidl*, 65 N.J. 257, 321 A.2d 225 (1974). *Lambert* involved the question whether a person confined under a state court civil contempt order until he disclosed the identity of the individual who discharged a weapon in the direction of other persons may challenge his confinement on constitutional grounds in a habeas corpus suit brought in federal court. In *In re Farr*, a newspaper reporter who had published information that was within the ambit of a "gag order" was adjudged in civil contempt and ordered incarcerated until he revealed who provided him with the information. Finally, in *Catena*, a reputed underworld figure was imprisoned in 1970 until he was prepared to testify before the State Commission of Investigation, whose term had been extended to December 31, 1979; at the time of his release he had been held for five years.

well established that criminal penalties may not be imposed in civil contempt proceedings.[12] According to these courts, even though the government may still have an interest in obtaining the information requested from a recalcitrant witness and the witness can still purge himself of contempt by testifying, he may no longer be held once it becomes evident that the duress will not succeed in breaking his silence. Typical is the reasoning of the New Jersey Supreme Court in *Catena v. Seidl*, 65 N.J. 257, 262, 321 A.2d 225, 228 (1974):

> It is abhorrent to our concept of personal freedom that the process of civil contempt can be used to jail a person indefinitely, possibly for life, even though he or she refuses to comply with the court's order. Most commentators agree that in civil contempt proceedings involving an adamant contemnor, continued imprisonment may reach a point where it becomes more punitive than coercive and thereby defeats the purpose of the commitment. "Contempt: Civil Contempt Order May Not Include Absolute Sentence," 47 Minn. L.Rev. 907 (1963); "The Coercive Function of Civil Contempt," 33 U.Chi.L.Rev. 120 (1965); See also Goldfarb, The Contempt Power (1963), Colum.Univ.Press. The legal justification for commitment for civil contempt is to secure compliance. Once it appears that the commitment has lost its coercive power, the legal justification for it ends and further confinement cannot be tolerated.

■ As indicated by the foregoing passage from *Catena*, the limitation referred to there was initially conceived as being logically rooted in the theory undergirding civil contempt. Subsequently, however, the Ninth Circuit recognized in *Lambert v. State of Montana*, 545 F.2d 87 (9th Cir. 1976), that once the confinement ceases to have any coercive impact, continued imprisonment for civil contempt also constitutes a violation of due process. The *Lambert* tribunal observed that the Supreme Court has had a number of occasions to discuss the due process implications of continued, nonpunitive confinement in contexts closely related to civil contempt. In *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Supreme Court was faced with a mentally deficient deaf mute who, having been determined by physicians to lack sufficient comprehension to be able to stand trial for two robberies, was committed to a state mental institution until such time as he became sane and could stand trial. And, in *McNeil v. Director, Patuxent Institution*, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), the Supreme Court reviewed the confinement of a convicted person for an indefinite period, already in excess of the sentence imposed, that was to terminate only when that person submitted to a psychiatric examination to ascertain whether he should be committed to a mental institution as a defective delinquent. The standard enunciated in *Jackson* and repeated in *McNeil* is that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[13] Accordingly, the court in *Lambert* reasoned, inasmuch as imprisonment for civil contempt is for the purpose of compelling compliance with a judicial directive, when the confinement has lost its coercive force and consequently no

---

12. *See, e.g., Gompers, supra,* 221 U.S. at 442–52, 31 S.Ct. 492. It appears that in denominating a confinement as being "coercive," or "punitive," the courts referred to in note 11 *supra* are applying a somewhat different criterion from that traditionally used to distinguish between civil and criminal contempt. In making the latter distinction, courts generally look to the predominant *purpose,* as well as to the *character,* of the sanctions imposed. *See* note 6 and accompanying text, *supra,* as well as authorities cited therein. With respect to this new constraint on the civil contempt power, however, it is not the *purpose* of the confinement that appears to be controlling, *see* text immediately *infra,* so much as the notion that the point has been reached where further confinement on the basis of a summary proceeding is abhorrent because the imprisonment is manifestly devoid of coercive *effect.* At that point, the label, "punitive," is affixed to the imprisonment.

13. 406 U.S. at 738, 92 S.Ct. at 1858; 407 U.S. at 250, 92 S.Ct. 2083.

longer bears a reasonable relationship to the purpose for which the contemnor was committed, due process requires that he be released.[14]

■ Although the due process test is easily formulated, the point at which coercive imprisonment actually ceases to be coercive and essentially becomes punitive is not readily discernible. Obviously, the civil contempt power would be completely eviscerated were a defiant witness able to secure his release merely by boldly asserting that he will never comply with the court's order. What has emerged, therefore, is a practice whereby the contemnor must bear the burden of establishing that there is no "substantial likelihood" that continued confinement would accomplish its coercive purpose.[15] Moreover, it has been held that this burden is not met where the contemnor's past silence "can be rationally attributed to considerations other than an adamant refusal to purge himself of contempt despite the consequences."[16] Even so, application of the due process standard to specific situations remains difficult, since the objectively identifiable facts—such as age, state of health, and length of imprisonment of the contemnor—often fail to provide a clear indication whether or not further confinement will increase the likelihood that the contemnor will accede to the court's demands.[17]

## III.

The often perplexing task of determining whether the confinement has essentially become punitive is ameliorated in the present case by the fact that Braun was incarcerated pursuant to 28 U.S.C. § 1826(a), which sets a maximum limit of eighteen months imprisonment for recalcitrant witnesses found to be in civil contempt of court. In this respect, Braun's incarceration differs from the indeterminate period of confinement for civil contempt—imposed pursuant to state law and practice—that marked the cases in which courts have held that at some point the confinement ceases to be coercive and becomes punitive, thereby raising due process concerns. This difference is not without significance: the maximum limit found in the federal civil contempt statute reflects a deliberate congressional attempt to resolve the problem of drawing a line between coercion and punishment.

Section 1826(a) was enacted as part of Title III of the Organized Crime Control Act of 1970,[18] legislation aimed at breaking the hold of organized crime over certain businesses and other segments of society.[19] The sections of this legislation governing recalcitrant witnesses were framed with an eye toward coercing members of secret syndicates to disobey their vows of silence and to cooperate in grand jury investigations.[20] Section 1826(a) was described as codifying the existing practice governing civil con-

14. *Lambert, supra*, 545 F.2d at 89–90. This does not mean that as a matter of due process a court may not initially order that a contemnor be confined until he complies with the court's order. Such a practice has implicitly been approved by the Supreme Court. *See, e. g., Shillitani, supra*, 384 U.S. at 370–71 & n.6, 86 S.Ct. 1531. All that *Lambert* appears to mean by invoking the due process clause is that if and when it becomes manifest that continued imprisonment will not result in compliance, the confinement then becomes punitive in character and the contemnor must be released.

15. *See, e. g., Lambert, supra*, 545 F.2d at 90–91; *In re Farr, supra*, 36 Cal.App.3d at 584, 111 Cal.Rptr. at 653–54; *Catena, supra*, 65 N.J. at 263, 321 A.2d at 228.

16. *Catena, supra*, 65 N.J. at 264, 321 A.2d at 229.

17. The difficulty in gauging these factors is reflected in the per curiam, majority and dissenting opinions in *Catena, supra*, 65 N.J. 257, 321 A.2d 225; 68 N.J. 224, 343 A.2d 744, although in that case the length of the contemnor's confinement—five years—seems to have been important in ultimately tipping the scales in favor of releasing him.

18. Pub.L. No. 91–452, 84 Stat. 922 (1970).

19. *See id.*, at Statement of Findings and Purpose; *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 1073, 1073.

20. *See Hearings Before Subcommittee No. 5 of the House Committee on the Judiciary on S. 30 and Other Proposals*, 91 Cong., 2d Sess. 99–100 (1970) (statement of Senator McClellan).

tempt for a refusal to comply with a court order to testify or to produce documents.[21] As originally proposed in the Senate bill and as passed by that body, the section placed no limitation upon the period for which an intransigent witness might be confined, other than to state that he may not be held beyond the life of the grand jury, including extensions.[22]

Serious opposition was mounted against the provision when it was debated at the House subcommittee level. It was contended that the absence of any specified time limitation on the period for which a witness could be incarcerated rendered the provision unduly harsh and gave it a punitive character. Thus, for example, the Committee on Federal Legislation of the Association of the Bar of the City of New York submitted this commentary:

> It should be noted, however, that the increased life of special grand juries proposed in Title I would allow confinement without trial for civil contempt before such a grand jury for up to three full years, compared with the previous limit of eighteen months. In contrast, in the case of criminal contempt, a defendant would be entitled to a jury trial if he were imprisoned for a period in excess of six months. *Cheff v. Schnackenberg*, 384 U.S. 373, 380, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966). Some of us believe that increasing the maximum length of a civil contempt commitment from eighteen months to three years is perfectly compatible with the requirement of a jury trial for criminal contempt sentences in excess of six months. . . . *Others, however, feel equally strongly that there must be some limit on the length of civil contempt sentences.* They doubt whether the carefully drawn protections afforded the criminal contemnor can constitutionally—or should as a matter of policy—be circumvented by a civil contempt sentence for as long as three years. In their view, *it becomes apparent at some point in time that factors such as the fear of retribution will prevent a witness from testifying, no matter how long he is incarcerated. At that point, it is questionable whether further confinement can be regarded as remedial, rather than punitive, and the assertion that the defendant could be released by testifying has little meaning because it has become clear that he will never testify.*[23]

Confronted squarely with the challenge of ensuring that civil contempt not be used to inflict punitive periods of imprisonment, the House subcommittee adopted the suggestion[24] that Title III be amended to add a prohibition against confining a recalcitrant

**21.** H.R.Rep. No. 91–1549, 91 Cong., 2d Sess. 46, *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 4007, 4022.

**22.** S. 30, 91 Cong. 1st Sess. § 301 (1969).

**23.** *Hearings, supra* note 20, at 306–07 (emphasis added). *See also id.* at 383 (statement of Herman Schwartz); *id.* at 440 (statement of Charles Bellows); *id.* at 471 (Statement of Rep. Edward Koch); *id.* at 494 (statement of Lawrence Speiser) ("Where a witness is subjected to a 3 year confinement and is willing to suffer that, rather than testify, it becomes clear that the coercion is inadequate, as in the case of a mobster who, though imprisoned for years, refuses to testify for fear of torture and death. The imprisonment has ceased to be coercive and has become punitive."); *id.* at 554 (statement of Section of Criminal Law of the ABA); *id.* at 684 (letter of Charles Rogovin).

**24.** The proposal eventually adopted apparently was initially suggested by Charles Rogovin, former Administrator of the United States Law Enforcement Assistance Administration. In the course of his discussion of Title III he stated:

> I am concerned, however, about the absence of any specified time limitation on the period for which a witness could be incarcerated under Title III.
>
> \* \* \* \* \* \*
>
> It is true, of course, that such a witness in a sense receives a self-inflicted wound, since by testifying he could have obtained his release from confinement at any time. I am troubled, nevertheless, by the absence of any legislative limitation upon the period for which a witness who remains recalcitrant can be confined on the theory that his testimony is being compelled by the confinement.
>
> Protection against such abuse could be provided, while maintaining the essential effectiveness of civil contempt confinement, by amending Title III to add a prohibition against confining a witness for civil contempt for a period exceeding 18 months. If such an amendment were made the time limitation

witness for civil contempt for any period in excess of eighteen months. Thus, the House version of the provision, which was eventually enacted as 28 U.S.C. § 1826(a), embodies a legislative balance between two competing values. On the one hand, it preserves the efficacy of the civil contempt power as a weapon for investigating organized crime. On the other hand, it meets the concern that the civil contempt power not be abused by employing it to punish an intractable witness beyond that point where it becomes evident that his testimony cannot be coerced through further confinement.

■ Given the legislative determination that a balance is to be struck between these competing values by placing an eighteen-month limit upon confinement for civil contempt, we are reluctant to conclude, in the absence of unusual circumstances, that, as a matter cognizable under due process, confinement for civil contempt that has not yet reached the eighteen-month limit has nonetheless lost its coercive impact and become punitive.[25] Of course, a court may not abdi-

cate its responsibilities under the Constitution simply because Congress has legislated in a particular area. But Congress has, in effect, addressed essentially the same problem that courts must tackle under a due process analysis, and has thereby filled the void that existed under prior practice, where there was a possibility that unconscionable, indeterminate periods of confinement might be imposed for civil contempt. It has not been suggested that Congress's resolution of the problem is unreasonable, and it would therefore appear to be inappropriate for the judiciary to substitute its judgment for that of the legislative body by undertaking as a routine matter to draw finer lines than Congress has already drawn between coercive and punitive periods of confinement.[26]

### IV.

■ Turning back to the present case, Braun has not alleged any facts that would warrant a departure, at least at this time, from the eighteen-month benchmark laid down by Congress in § 1826(a). Braun's

should be expressed in terms of the total period of authorized confinement which cannot be exceeded, the term, as extended, of the grand jury, but, in any event, not longer than 18 months from the date that the witness is placed in confinement. It would not be desirable to state such a limitation, for example, in terms of requiring release on termination of the grand jury's original term, since witnesses called to appear before the grand jury late in its term would have progressively less incentive to respond to the legitimate inquiries of the grand jury.
*Hearings, supra* note 20, at 684 (letter of Charles Rogovin).

25. Such unusual circumstances may well be present, for example, where a business associate of the contemnor, who had also been held in civil contempt for refusing to testify out of fear for his life, finally complied with the grand jury subpoena and was immediately murdered or maimed.

26. Nor, for that matter, do we deem it advisable as a general matter to chip away at the period of coercive imprisonment that is imposed by the statute by declaring one or two months before its termination that it is obvious that the contemnor no longer has any incentive to testify and should therefore be released. In view of the "snowball" effect that such an approach may have in undercutting the intended coercive "bite" of the incarceration, confine-

ment of the contemnor for the full period initially imposed does not seem to rise to the level of a deprivation of due process.

A somewhat analogous situation to the one presented here—namely, a situation where Congress had addressed the same problem of determining what is a reasonable time period as courts are required to address under constitutional guidelines—has arisen in those cases dealing with the interrelationship between the right to a speedy trial, *see Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and the various federal and state speedy trial acts, *see, e. g.,* 18 U.S.C. §§ 3161–74 (1976). In *United States v. Carini*, 562 F.2d 144, 152 & n.8 (2d Cir. 1977), for example, the court stated that the "most significant distinction" between the constitutional claim to a speedy trial raised in the earlier case of *United States v. Lane*, 561 F.2d 1075 (2d Cir. 1977), and the claim in *Carini* is that Lane had been brought to trial within the time specified in the Speedy Trial Act. Of course, as the Speedy Trial Act explicitly recognizes, *see* 18 U.S.C. § 3173 (1976), and as we declare here, adherence to the time period established by Congress does not bar judicial scrutiny under the applicable constitutional standard. *See, e.g., United States v. Herman*, 576 F.2d 1139, 1144 n.3 (5th Cir. 1978) (speedy trial claim).

motion, filed when he had served less than three months for contempt, rests primarily on the argument that his persistent refusal to cooperate with the government in the past, dating back to November, 1976, demonstrates that he will not testify in the future. But this history of non-cooperation is not in itself sufficient to meet the heavy burden that Braun must bear in order to establish that his confinement pursuant to § 1826(a) is in violation of due process. Many persons, if given a free and unfettered choice, would prefer not to compromise the illegal dealings of their associates, and thus Braun's behavior prior to his being held in contempt does not persuasively demonstrate that he will not yield under the coercive impact of imprisonment. Nor does Braun's continued silence during the relatively few months that he has been held in coercive imprisonment—far less than the eighteen months that in Congress's view approached the punitive level—necessarily mean that he will not succumb under the pressure of further confinement. Indeed, incarceration of intransigent witnesses for civil contempt is premised on the notion that the desire for freedom, and concomitantly the willingness to testify, increases with the time spent in prison. And, although at oral argument counsel urged that consideration ought to be given to the poor health and advanced age of Braun and his wife, these factors could just as well be seen as weighing in favor of the coercive impact of additional confinement, at least at this stage of Braun's incarceration.

In sum, we cannot say on the basis of the averments set forth in the motion and the allegations made at oral argument that Braun's continued imprisonment—up to a total of eighteen months—for civil contempt is so devoid of coercive purpose as to justify substituting our judgment for that of Congress and holding that such confinement violates due process. Moreover, because Braun has suggested nothing in the way of unusual circumstances that would support an inference that he is being deprived of due process under the standard that, in our view, is generally to be applied to confinements under § 1826(a), we decline to accept his claim that he should have been afforded an evidentiary hearing before the district court ruled on his motion.[27]

### V.

It should be emphasized that § 1826(a) specifies a maximum time limit for confinement for contempt, and a district judge may in his discretion either impose at the outset a shorter period of incarceration or reduce the period later as circumstances warrant.[28] Although an evidentiary hearing may ofttime be helpful in assisting the district judge in exercising his discretion, on the record before us we cannot say that the district judge abused his discretion in declining to grant an evidentiary hearing and in denying Braun's motion.[29]

In light of the foregoing, the order of the district court will be affirmed.

---

**27.** Braun bases this claim of entitlement to an evidentiary hearing on the passage in *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), wherein it is stated: "Once it is determined that due process applies, the question remains what process is due."

**28.** *See, e.g., In re Cueto*, 443 F.Supp. 857 (S.D.N.Y.1978) (after concluding that the coercive imprisonment under § 1826(a) was not violative of due process, the court nonetheless exercised its discretion and terminated the confinement). *See also In re Buonacoure*, 412 F.Supp. 904, 907 (E.D.Pa.1976).

**29.** Braun also asserted in his motion that the government's timing in seeking to coerce his testimony—waiting nineteen months after his conviction and until he had served one-third of his two year sentence—was inherently unfair and an abuse of the immunity statute. Inasmuch as decisions regarding the subpoenaing of witnesses to appear before a grand jury and the immunization of those witnesses are largely left to prosecutorial discretion, this claim appears to be without merit. *See United States v. Herman*, 589 F.2d 1191, 1200–03 (3d Cir. 1978) (immunization of witnesses); *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, 89–90 (3d Cir. 1973) (grand jury subpoenas).