**In the Matter of the Subpoena Served Upon Bernardine DOHRN.**

**No. M–11–188.**

United States District Court,
S.D. New York.

Jan. 4, 1983.

As Amended Jan. 5, 1983.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for the United States of America by Robert S. Litt and Stacey J. Moritz, Asst. U.S. Attys., New York City, of counsel.

Michael Kennedy, Joseph Calluori, Michael Kennedy, P.C., New York City, for Bernardine Dohrn.

## MEMORANDUM AND ORDER

GOETTEL, District Judge.

On May 19, 1982, this Court found Bernardine Dohrn[1] in contempt of court because of her refusal to comply with the Court's order to provide a sample of her handwriting to a federal grand jury. She was ordered confined pursuant to 28 U.S.C. § 1826 until she complied with the Court's order. Before this Court is Dohrn's motion to vacate the contempt order.

The grand jury investigation that underlies this motion resulted from a violent armed robbery of a Brinks armored truck in Nanuet, New York on October 20, 1981. (The perpetrators stole $1.6 million, murdered a Brinks guard, and during their escape, which was aided by several confederates, murdered two more policemen.) Thus far, the investigation has uncovered a widespread criminal conspiracy to commit armed

---

1. Dohrn had been a member of the Weather Underground and was, for a number of years, a fugitive living underground. She has been pub- lically associated with a number of extreme political causes.

robberies, murders, prison escapes, and other crimes. It has also led to the indictment of eleven persons, including four fugitives.

One of the crimes under investigation by the grand jury is a one-half million dollar armored car robbery that occurred in Inwood, New York in April, 1980. According to the Government, "the evidence before the grand jury suggests that Dohrn, then employed as a salesperson at a Manhattan store, obtained for the conspirators driver's license information that was used fraudulently to obtain a duplicate driver's license which, in turn, was used to rent a station wagon [that was used in the robbery]." Affidavit of Robert Litt ¶ 3.[2] In an effort to determine whether Dohrn had forged the signature on the application for a duplicate driver's license, the grand jury subpoenaed Dohrn on May 13, 1982, to provide handwriting exemplars.

Dohrn moved to quash the subpoena on May 17, 1982. The Court, however, denied her motion and ordered her to comply. When she refused, the Court held her in contempt.

Dohrn has now been confined at the Metropolitan Correctional Center (MCC) for seven months.[3] Throughout this time, she has remained adamant in her refusal to furnish handwriting exemplars or to cooperate with the grand jury in any way. Indeed, two of the nation's leading attorneys, persons with no sympathy for her political views, have described Bernardine Dohrn as a person having "a view of the law and a view of life and her rights and obligations that is myopic, convoluted, unrealistic, childish, and inexplicable." They have also concluded that "Bernardine Dohrn is intractable in her views and beliefs to the point of fanaticism [and] may well perceive herself as a second Joan of Arc[,] now suffering an ordeal that must be endured for the causes she believes in, whatever they might be." [4] She now moves to vacate the contempt order because there is no probability that further incarceration will compel her cooperation.

*Discussion*

At the outset, two points should be made. First, a contemnor's self-serving statement that he or she will not cooperate should not, by itself, be considered by courts in determining whether to impose or continue to enforce an order of civil contempt. If it were, very few persons could ever be compelled to testify or cooperate. *See United States v. Dien,* 598 F.2d 743, 745 (2d Cir.1979). Second, except in unusual circumstances, courts should not conclude "that, as a matter cognizable under due process, confinement for civil contempt that has not yet reached the eighteen-month limit [of 28 U.S.C. § 1826] has nonetheless lost its coercive impact and become punitive." *In re Grand Jury Investigation (Braun),* 600 F.2d 420, 427 (3d Cir.1979) (footnote omitted).

2. Although it was initially suggested that Dohrn might have been an active participant in the robbery, the Government now merely suggests that, at the least, she might have been an unwitting facilitator of the criminal activity.

3. Dohrn was, however, granted a two-day furlough to get married.

4. Affidavit of Don H. Reuben of Chicago, concurred in by the Honorable Harold R. Tyler, Jr.
It should also be noted that, immediately following Dohrn's imprisonment, a letter writing campaign on her behalf was apparently launched, and this Court received scores of letters from people who share Dohrn's political beliefs, condemning her incarceration and claiming that it was for purposes of political persecution. (The pattern of all the letters indicated that the contents had been suggested by a form letter.) This Court notes, however, that it sees no indication whatever that Dohrn is being held as a political prisoner or persecuted in any way.
More recently, the Court has received many letters from attorneys, predominantly those associated with liberal causes, who have proclaimed that Dohrn will never cooperate with the grand jury and, consequently, her incarceration is serving no compulsive purpose and has become punitive in nature. These attorneys have concluded, without having heard the other side of the case, that Dohrn has no meaningful information and that her refusal to give the handwriting exemplars is simply a matter of principle. It has been this Court's experience that most of those who claim that their refusal to comply with grand jury demands is a "matter of principle" are usually co-conspirators attempting to conceal their own criminal involvement.

Be that as it may, the Court still retains the power to release a recalcitrant witness whenever it concludes that further incarceration will not cause the witness to testify. *See In re Grand Jury Investigation (Braun), supra,* 600 F.2d at 428; Hearings on H.R. 94, 95th Cong., 1st Sess. 713 n. 1 (1977) (statement of Benjamin Civiletti, Ass't Attorney General); *id.* at 742–43 (testimony of Benjamin Civiletti, Ass't Attorney General); *cf. Soobzokov v. CBS, Inc.,* 642 F.2d 28, 31 (2d Cir.1981) ("When it becomes obvious that sanctions are not going to compel compliance, they lose their remedial characteristics and take on more of the nature of punishment.). Moreover, the court retains the ability to determine the length of incarceration in light of, not only the apparent lack of effect of incarceration, but also the surrounding circumstances and the need for the witness's evidence. *In re Cueto,* 443 F.Supp. 857, 864 (S.D.N.Y. 1978).

This is a case in which the Court is inclined to exercise its power to release a recalcitrant witness. First, it has become increasingly clear to this Court that Dohrn's recalcitrance will continue and that further incarceration will not compel her to cooperate. Second, the importance of Dohrn's handwriting exemplars has diminished over time. Despite Dohrn's recalcitrance, the grand jury investigation has proceeded apace, and, as noted above, a number of indictments have been returned. (Dohrn, however, has not been indicted and has not even been named as a coconspirator in the existing indictments.) Moreover, according to a newspaper article in late November 1982, one of the major participants in the Inwood robbery has agreed to cooperate with the Government in its investigation. Third, to the extent that the Government needs samples of Dohrn's handwriting, it already has such samples at its disposal. The Court has recently learned that the FBI has had, for a number of years, enough of Dohrn's handwriting to make a comparison with a questioned document and did so at an earlier time. In addition, Dohrn has written letters to the Court and has filed petitions with the Warden of the MCC concerning prison conditions.

Nevertheless, the Government does not concede that the handwriting samples at its disposal are adequate. Although it acknowledges that, by comparing the current writings with the earlier documents in its possession, it can conclude that Dohrn signed these documents, it does not acknowledge that it can establish that the body of each document was written by Dohrn. This position is tenuous, however, because one need not be a handwriting analyst to observe that the handwriting in the letters is very similar to the signatures.

The Government also argues that neither the known exemplars nor the current specimens are sufficiently comparable to the questioned specimens to permit a judgment as to whether Dohrn wrote the questioned specimens. What it wants is for her to write the identical words or names that are on the questioned documents. This argument is also questionable. While a practicing lawyer, I had substantial experience with questioned documents. It is reasonably easy to determine whether a signature is a forgery if adequate specimens are presented. On the other hand, if all that is involved is a signature, it is extremely difficult to determine who wrote the forged signature. Indeed, if the person writing the signature attempted to imitate the handwriting of the person whose signature is being forged, it becomes impossible. Moreover, if a person who forged a signature is requested to write a few words, particularly a name, in a certain manner and if that person recalls the manner in which he previously wrote the signature, he can very easily change significantly the manner in which the exemplar is delivered.[5] Spontaneous writings such as those presently in the possession of the Court and the

---

5. Dohrn's counsel knows the name on the forged application and the prosecution believes that an attempt was made by the forger to conceal the writer's natural handwriting. In this situation, the value of the demanded exemplars is highly questionable even if Dohrn was the forger.

Government provide a much more accurate basis for identifying the handwriting of the subject. Nevertheless, the Government continues to insist upon having Dohrn execute specific exemplars, and Dohrn continues to resist. This leaves the Court between the immovable object and the irresistible force, an unpleasant place to be.

The Court does not believe that Judge Edelstein's recent opinion concerning Eve Rosahn, *In re Eve Rosahn,* 551 F.Supp. 505 (S.D.N.Y.1982), compels a conclusion different from the one reached here. Rosahn is another person held in contempt because she failed to comply with a court order directing her to provide the same grand jury with photographs, fingerprints, handwriting exemplars, and hair samples. After nine months in jail, she moved to vacate the contempt order, arguing that she was being persecuted as a political activist and that there was no purpose in confining her because her continued refusal to cooperate after nine months in jail substantiated her prior assertions that she would never cooperate with the grand jury.[6] (Like Dohrn, *see supra* note 4, she too submitted numerous testimonials to her adamancy.)

Judge Edelstein granted the motion in part and denied it in part. He vacated that part of the order requiring Rosahn to submit to fingerprinting because the Government already had in its possession major case fingerprints of Rosahn. *Id.,* at 508–509. He noted that "[a]s the grounds for contempt narrow, this court becomes concerned. To hold a contemnor, who is currently not charged with any crime, in jail for eighteen months for her refusal to supply items already in the government's possession would be a travesty of justice." *Id.,* at 509 (footnotes omitted).[7] Judge Edelstein, however, refused to vacate that part of the order concerning the hair and handwriting samples. He reasoned that Rosahn

is closely connected with the criminal activity—her car was used in the [Brinks] robbery, and there is evidence that she rented a van that was also used. She has indicated her support for the criminal activity being investigated. Hair samples and written materials related to the criminal activities being investigated are as yet unidentified, but suspected to belong to Rosahn, so the subpoenaed items are directly relevant and important. Finally, samples of Rosahn's hair and handwriting samples can be obtained from no source other than Rosahn herself. Thus this court finds no basis for exercising its discretion to order Rosahn's release.

*Id.,* at 508 (footnote omitted).

This Court agrees completely with the result reached by Judge Edelstein. Any difference in the conclusion reached by this Court results solely from factual differences between the cases. For example, in Rosahn's case, her direct connection with the criminal activity was more clearly established, the importance of the evidence to the grand jury appeared greater, and the Government did not have the hair and handwriting samples in its possession. Moreover, the Court believes that the reasons for reaching the result in this case are virtually identical to the reasons Judge Edelstein vacated that part of his order requiring Rosahn to submit to fingerprinting. As noted above, the Government now possesses a number of spontaneous exemplars of Dohrn's handwriting. The need for the additional exemplars has not been demonstrated, and the value of the additional exemplars is extremely questionable. In light of the contemnor's attitude, this Court runs the risk of imprisoning her for eighteen months for no discernible purpose, other than to justify her desire to be a martyr

---

**6.** These arguments were previously made and rejected by Judge Edelstein and the Court of Appeals.

**7.** According to Judge Edelstein,

this [was] the second error of this sort that the government has made in this case. At the grand jury the government maintained that it had no photograph of Rosahn, but

conceded in argument before the court of appeals that it did. The court accordingly vacated that part of the contempt order requiring Rosahn to submit to photographing. *Id.,* at 509. Consequently, he also ordered the Government to search their files for the other subpoenaed items. *Id.,* at 509.

and the Government's insistence that she comply.

In sum, factors such as the likely failure of further incarceration to compel Dohrn's cooperation, the diminished importance of Dohrn's handwriting exemplars, and the availability of spontaneous exemplars of Dohrn's handwriting, when taken together, lead this Court to the conclusion that its order of contempt should be modified. Thus, the order of contempt is modified to direct Dohrn's release from jail at this time.[8]

SO ORDERED.

---

8. Dohrn was furloughed shortly before Christmas because the Court thought that this opinion would take some time to prepare and be-cause it seemed likely that it would reach the decision rendered today.