**UNITED STATES of America**

v.

**William Oscar HARRIS a/k/a "Oscar El Hari, Bey," William Oscar Harris, Appellant.**

No. 08–1553.

United States Court of Appeals, Third Circuit.

Argued: June 26, 2009.

Opinion Filed: Sept. 23, 2009.

Edward F. Borden, Jr., Esq., (Argued), Earp Cohn, Cherry Hill, NJ, for Appellant.

Norman Gross, Esq., (Argued), Office of United States Attorney, Camden, NJ, George S. Leone, Esq., Office of United States Attorney, Newark, NJ, for Appellee.

Before: BARRY, SMITH, Circuit Judges, and DuBOIS,[*] District Judge.

## OPINION OF THE COURT

BARRY, Circuit Judge.

William Oscar Harris appeals from the District Court's denial of his motion to vacate an order of civil contempt that has been in effect for over five years. The order of contempt has its roots in an underlying criminal proceeding in which Harris was convicted of conspiracy and fraud and sentenced to 188 months' imprisonment. The clock on that 188–months, however, has yet to begin ticking: for the past five years, Harris has been incarcerated on the order of contempt that resulted from his refusal to comply with an order entered in the underlying proceeding. Because the Court structured the order of contempt so that it tolled the commencement of Harris's criminal sentence, only if and when the contempt is

lifted will he begin serving that sentence. We will affirm.

## I.

Harris considers himself a member of the so-called Al–Moroccan Empire, a group that believes the Uniform Commercial Code can be deployed to gain access to secret "straw man" bank accounts held by the United States Department of the Treasury; indeed, Harris considers himself to be a "Moorish sovereign being."[1] These claimed beliefs, and actions taken in reliance upon them by Harris and his cohorts, have come at a price: on May 6, 2003, he and various of those cohorts were indicted on a panoply of conspiracy and fraud counts arising from the production and distribution of fraudulent financial documents.

The events which ultimately led to this appeal began following the indictment. Harris and his co-conspirators sent out bogus financial documents that purported to create liens and judgments against the judges and prosecutors involved in the underlying prosecution. In response, the government moved for, and the District Court granted, a temporary restraining order (and eventually a permanent injunction) that prohibited Harris and his co-conspirators from continuing those activities.

Unfortunately, the restraining order and injunction did not have the desired effect, and the harassing activities continued unabated. As a result, the District Court held a show-cause hearing on April 13, 2004. Following this hearing, the Court held Harris and his co-conspirators in contempt, and ordered that they be incarcerated until such time as they agreed, in

---

[*] Honorable Jan E. DuBois, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. Harris disputes the jurisdiction of the federal courts in a variety of ways, none of which is relevant here.

writing, to stop sending bogus liens and judgments. Granting a five-day grace period to allow for one last opportunity to comply, the Court ordered that Harris's contempt begin on April 27, 2004.[2] The Court later dropped the writing requirement, stating that it would lift the contempt if Harris simply "affirmatively ceased sending out new documents." (App.163a.)

Trial in the underlying criminal proceeding began on June 7, 2004. On July 2, 2004, Harris was convicted on all counts of the indictment, and was subsequently sentenced to 188 months' imprisonment with that sentence to follow his confinement for civil contempt. He appealed, and we affirmed the judgment of sentence.

Harris has continued to send out bogus documents and, accordingly, has remained incarcerated for contempt for the entirety of the past five years. In November 2007, he filed a *pro se* motion that recycled his oft-rejected arguments about the jurisdiction of the federal courts, *see supra* note 1, a motion the District Court construed as one to terminate Harris's sentence for civil contempt—and, as we characterize it for purposes of this Opinion, a motion to vacate the order of civil contempt. The Court gave careful consideration to each of Harris's arguments, and on February 20, 2008 denied the motion. We cannot overemphasize the fact, and fact it be, that throughout the proceedings before the District Court, the Court scrupulously avoided basing its finding of contempt on any conduct directed by Harris against it and at all times displayed extraordinary patience.

The District Court had jurisdiction pursuant to 18 U.S.C. § § 401 and 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the Court's legal conclusions *de novo*, and will reverse "only where the decision is based on an error of law or a finding of fact that is clearly erroneous." *Marshak v. Treadwell,* ── F.3d ──, 2009 WL 1886153 (3d Cir.2009).

## II.

■ It has long been recognized that courts possess the inherent authority to hold persons in contempt. *See United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812) ("To fine for contempt-imprison for contumacy—inforce the observance of order ... are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."); *see also Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). There are two types of contempt, civil and criminal, and it is not always easy to distinguish between them: as the Supreme Court has observed, the distinction is "somewhat elusive." *Bagwell,* 512 U.S. at 830, 114 S.Ct. 2552.

■ Civil contempt orders are intended to be coercive or compensatory in nature, and do not require, *inter alia,* a jury trial. Rather, civil contempt is imposed by the judge upon a finding that one has failed to comply with a valid court order. *See Shillitani v. United States,* 384 U.S. 364, 370–71, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) ("The conditional nature of the imprisonment—based entirely upon the contemnor's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury, provided that the usual due process requirements are met.") (internal citations and quotations omitted); *Bagwell,* 512 U.S. at 827, 114 S.Ct. 2552 ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are

---

**2.** When two of Harris's co-conspirators stopped sending out fraudulent documents, the orders of contempt as to them were promptly lifted.

considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required.").

With civil contempt, the contemnor will be released subject to compliance with some condition. He is thus understood, in a by-now familiar observation, to "carr[y] the keys of his prison in his own pocket." *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552 (internal citations and quotations omitted). At the same time, the civil contempt power is regarded as "uniquely ... liable to abuse" because such "proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Id.* at 831, 114 S.Ct. 2552 (internal citations and quotations omitted).

■ Criminal contempt, on the other hand, is punitive in nature—it punishes for some past contumacious act. A person subject to criminal contempt is entitled to greater procedural protections than a person subject to civil contempt: most importantly, the purported contemnor has a right to trial by jury. *See, e.g., Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

### III.

Harris claims that his order of contempt is de facto an order of criminal contempt because it is, or has become over the passage of time, punitive in nature. He thus argues that for two reasons the order must be lifted because criminal contempt requires a trial by jury and other procedural protections that have not been afforded to him.

Harris contends, first, that the District Court could not continue to hold him in contempt after the termination of the underlying proceeding. He also contends that regardless of the merits of the order of contempt and his admitted ability to comply with that order, due process imposes a freestanding and discernible temporal limitation on the Court's contempt authority. We disagree with both contentions, and address them in order.

### A.

It is Harris's contention that a district court cannot continue to hold a person in contempt once the underlying proceeding that gave rise to the contempt has terminated. Here, it is undisputed that the underlying proceeding is final and complete: Harris has been convicted and sentenced, and his appeal was unsuccessful. Thus, he posits, the Court exceeded its authority in continuing the contempt.

The precise nature and contours of Harris's argument are a bit muddled. Strictly speaking, he does not make a jurisdictional argument,[3] although what he argues does relate to a court's power: in essence, the argument goes, a court's power over the parties before it necessarily terminates at the conclusion of the proceeding. In support of his position, he plucks a quote from the Fifth Circuit: "[i]f the civil contempt proceeding is coercive in nature, the gen-

---

3. The District Court quite clearly had jurisdiction to issue and continue the order of contempt. 18 U.S.C. § 401 provides that:

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
  (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

  (2) Misbehavior of any of its officers in their official transactions;
  (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

Jurisdictionally speaking, the District Court had the power to hold Harris in contempt, and confine him continually for that contempt, in light of Harris's "resistance to its lawful ... order." *Id.*

eral rule is that it is mooted when the proceeding out of which it arises is terminated." *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 400 (5th Cir. 1987).

We do not disagree with this unremarkable proposition, as most orders of civil contempt are inextricably intertwined with the underlying proceeding—civil or criminal—and thus rendered moot by that proceeding's end. To take a classic scenario, a recalcitrant witness is haled before a grand jury, and refuses to testify despite being granted immunity. If such a "witness" persists in his refusal to testify, a court will often hold him in contempt until such time as he complies. Such a contempt, it is universally acknowledged, must end when the underlying proceeding is over: when the grand jury's term expires, the recalcitrant witness can no longer comply with the order and purge the contempt, so coercion has become a factual impossibility.

But other contempt orders are not mooted by the termination of the underlying proceeding. Indeed, the very case cited by Harris, *Petroleos Mexicanos*, illustrates that orders of civil contempt can outlive the underlying proceeding: the Fifth Circuit found that the termination of the underlying proceeding did *not* require that the contempt be lifted.[4] *See id.* at 400.

▇ Similarly, the termination of the underlying proceeding here has not rendered the order of contempt moot. Harris can, and he surely should, stop his harassment of the prosecutors and judges in-

volved in his case. Accordingly, the purpose and concomitant coercive intent of the order of contempt remain alive and well. Because the District Court's jurisdiction cannot seriously be challenged, and because we do not take issue with the Court's continued exercise of that jurisdiction, the Court did not abuse its discretion, under the circumstances before us, in refusing to vacate the order of contempt on this ground.

## B.

Stripped to its essence, Harris's second contention is that due process places a temporal limitation on the amount of time for which a civil contemnor can be confined, regardless of the validity of the underlying order on the merits and the contemnor's ability to comply with that order. Harris asserts that a coercive civil contempt necessarily becomes punitive after the passage of some period of time, and points to the eighteen-month period of confinement established by Congress for recalcitrant witnesses as an appropriate presumptive benchmark. *See* 28 U.S.C. § 1826. Because he has been incarcerated for more than five years, Harris contends that the District Court erred in denying his motion.

We reject that contention. As an initial matter, it is critical to emphasize two undisputed facts: first, the underlying order, on the merits, is unquestionably valid and eminently appropriate; second, as Harris himself admits, he is able to comply with the order at any time.[5] There is simply no

---

**4.** In *Petroleos Mexicanos,* the contempt did not end with the termination of the underlying proceeding because it was partially compensatory in nature and thus had a relevance independent of and extrinsic to the underlying proceeding. 826 F.2d at 400 ("This distinction rests upon the fact that the harm or injury that gives rise to the need for compensation continued unredressed at the end of the underlying litigation while the need for

getting a party to act in the underlying litigation necessarily terminates when that litigation ends.").

**5.** Due process would require, of course, that the courthouse doors be open for a contemnor to challenge the underlying order on the merits and prove a factual inability to comply with the order. Those arguments, however, are not before us here.

better example of a situation where a contemnor " ' "carries the keys of his prison in his own pocket." ' " *Bagwell,* 512 U.S. at 828, 114 S.Ct. 2552 (quoting *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (quoting *In re Nevitt,* 117 F. 448, 461 (8th Cir.1902))).

Harris argues, however, that due process requires that a district court lift a contempt order if there is no substantial likelihood that the contemnor will comply with the order.[6] In support of his argument, he points to our thirty-year old decision in *In re Grand Jury Investigation (Braun),* 600 F.2d 420 (3d Cir.1979) (hereinafter *"Braun"*). In *Braun,* a recalcitrant witness was given immunity from prosecution but refused to testify before the grand jury. After being held in contempt, the contemnor challenged his continued confinement, arguing that due process required that he be released before the expiration of the eighteen-month maximum period of confinement provided for in the Recalcitrant Witness Statute, 28 U.S.C. § 1826. We rejected that contention, and affirmed the district court's refusal to lift the contempt.

In so doing, we observed that even when "the witness can still purge himself of contempt by testifying, he may no longer be held once it becomes evident that the duress will not succeed in breaking his silence." *Braun,* 600 F.2d at 424. At the same time, we noted that "[o]bviously, the civil contempt power would be completely eviscerated were a defiant witness able to secure his release merely by boldly asserting that he will never comply with the court's order." *Id.* at 425. We then observed that other jurisdictions had placed

on the contemnor the "burden of establishing that there is no 'substantial likelihood' that continued confinement would accomplish its coercive purpose." *Id.*

For several reasons, we do not believe that *Braun* requires us to disturb the District Court's decision. For one thing, *Braun* is distinguishable in that it is a recalcitrant witness case: the ultimate holding in *Braun* arose squarely from the Recalcitrant Witness Statute. *See id.* (noting that the "often perplexing" due process issue in *Braun* "is ameliorated in the present case" by the Recalcitrant Witness Statute). That statute is wholly inapplicable here for one obvious reason: Harris is not, and was not, a recalcitrant witness.

Moreover, any language in *Braun* indicating our approval of the "no substantial likelihood" test has been seriously undermined in the past thirty years even were that language not dicta, which it is. In *Bagwell,* for example, the Supreme Court clearly indicated that there is no temporal limitation on the amount of time that a contemnor can be confined for civil contempt when it is undisputed that the contemnor has the ability to comply with the underlying order:

> The paradigmatic coercive, civil contempt sanction ... involves confining a contemnor *indefinitely until he complies* with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.

512 U.S. at 828, 114 S.Ct. 2552 (internal citations and quotations omitted) (emphasis added). Under such circumstances, the Supreme Court emphasized, "the contem-

---

**6.** Other courts, before *Bagwell,* adopted such a rule. *See Lambert v. Montana,* 545 F.2d 87, 90 (9th Cir.1976) (adopting a "substantial likelihood that continued confinement is no longer serving its purpose" test); *Catena v.*

*Seidl,* 65 N.J. 257, 321 A.2d 225, 228–29 (1974) (listing age, health, and length of confinement as relevant factors to the analysis of when coercive civil contempt becomes punitive).

nor is able to purge the contempt and obtain his release ... and thus carries the keys of his prison in his own pocket." *Id.* (internal citations and quotations omitted).

In *Chadwick v. Janecka,* 312 F.3d 597 (3d Cir.2002), we had occasion to discuss the implications of *Bagwell.* The petitioner in that habeas action, Mr. Chadwick, had been involved in a divorce in state court, and was found to have improperly transferred marital assets to third parties for the purpose of shielding them from the divorce court's jurisdiction (and, ultimately, his ex-wife's possession). In response, the state court held petitioner in contempt, ordering him incarcerated until he turned over the assets. Significant litigation concerning his confinement followed, and, after nearly seven years of confinement, his case reached us.

Petitioner did not argue that he was *incapable* of complying with the state court's order to turn over the assets, but rather that due process limited the amount of time for which the court could confine him for civil contempt.[7] The case was before us on habeas review, and we rejected petitioner's claim, concluding that the state court's determination was not "contrary to ... clearly established Federal law, as determined by the Supreme Court." [8] *Id.* at 606–07.

In the course of reaching this holding, then-Judge now Justice Alito squarely addressed *Bagwell* and its "indefinitely until he complies" language:

[Petitioner], however, urges us not to take *Bagwell* at face value. He contends that the phrase 'indefinitely until he complies' in *Bagwell* does not mean 'permanently and without other recourse.' Instead, he maintains that '[t]he word 'indefinitely' is apparently used in its most precise sense, to mean 'with no predetermined ending date.' We have no quarrel with this definition, but this understanding of the term 'indefinitely' does not explain away the critical statement in *Bagwell* that a civil contemnor may be confined 'indefinitely *until he complies.*'

The meaning of the statement in *Bagwell* that a contemnor may be held 'indefinitely until he complies' is perfectly clear. The phrase 'until he complies' sets the point in time when confinement must cease. The term 'indefinitely' describes the length of confinement up to that point, namely, a period 'having no exact limits,' because the end point (the time of compliance) cannot be foretold. Mr. Chadwick's contrary interpretation—that 'indefinitely until he complies' means 'indefinitely until he complies or it becomes apparent that he is never going to comply'—is insupportable.

*Id.* at 608 (internal citations and quotations omitted) (emphasis in *Bagwell* ).

■ We fully agree with this analysis of *Bagwell,* and thus conclude that, under the circumstances before us, the order of contempt was not only validly issued but val-

---

7. In earlier and later events in the *Chadwick* litigation, Chadwick did claim a factual inability to comply—*i.e.,* that he did not actually have control over the disputed assets. The Supreme Court recently denied his petition for a writ of certiorari from the latest round of litigation in the Pennsylvania state courts. *See Chadwick v. Holm,* 129 S.Ct. 2002, 173 L.Ed.2d 1087 (*cert. denied* April 20, 2009). The Court had years earlier denied his petition for a writ of certiorari from our decision. *See Chadwick v. Janecka,* (*cert. denied* April

28, 2003). On July 10, 2009, more than fourteen years after he was initially incarcerated for contempt, he was released.

8. We recognize that because of the habeas posture of the case, *Chadwick's* holding is limited to concluding that the *Supreme Court* had not clearly established due process limitations on the length of time a contemnor can be held in civil contempt. Nonetheless, we find *Chadwick's* discussion of the issues to be both powerful and persuasive.

idly continued.[9] Any incidental punitive consequences arising from the contempt can be squarely laid at Harris's own feet. We will not, as the District Court said so well, "dissolve a lawful order ... merely because the contemnor persists in violating it." (App.165a.) *Cf. Shillitani*, 384 U.S. at 370, 86 S.Ct. 1531 ("While any imprisonment, of course, has punitive and deterrent effects, it *must be viewed as remedial if the court conditions release* upon the contemnor's willingness to testify.") (emphasis added). The Constitution does not require such a perverse result.

Additionally, the order of contempt is not punitive simply because there are repeated and discrete violations of the underlying order. Indeed, "[m]ost contempt sanctions ... to some extent punish a prior offense as well as coerce an offender's future obedience." *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552. Because a court would not be justified in holding a person in contempt until he demonstrated a refusal to comply with an order, prior instances of disobedience will almost always accompany an order of contempt. Thus, the fact of prior instances does not mean that the order of contempt *punishes*; to the contrary, a valid order of civil contempt such as that before us reacts to prior instances of disobedience by seeking to compel and coerce *future* obedience. *See, e.g., id.* at 835, 114 S.Ct. 2552 ("But the distinction between coercion of affirmative acts and punishment of prohibited conduct is difficult to apply when conduct that can recur is involved, or when an injunction contains both mandatory and prohibitory provisions.").

We cannot conclude that an order such as the one at issue here could ever lose all of its coercive effect. After all, the order requires Harris to simply stop what he is doing, with the District Court indicating that a period of *inaction* is all that is needed for it to lift the contempt. Considering the benefit to be gained by Harris in complying with the Court's order—to wit, the lifting of the contempt and the commencement of the underlying sentence— we do not believe that the circumstances of this case present any constitutional problem.[10]

---

9. *Chadwick* also discussed *Braun*, noting that, "[i]n *Braun*, a panel of our court [agreed] ... that a civil contemnor who is simply unwilling to comply with the court order must be released after the passage of a certain period of time." *Chadwick*, 312 at 612 n. 13; *see also id.* at 612–13 (indicating that *Braun* cited approvingly, but in dicta, the "no substantial likelihood" test). In light of the habeas posture in which *Chadwick* presented itself, we did not decide whether *Bagwell* had rejected Harris's interpretation of *Braun*. *See Chadwick*, 312 F.3d at 613 ("We have no need here to decide whether [*Braun*] remains good law in light of *Bagwell*.").

10. *Shillitani v. United States* supports this conclusion. In *Shillitani*, two putative witnesses were subpoenaed to testify before the grand jury. After they refused to testify on Fifth Amendment grounds, they were granted immunity. Still, they refused to testify. Accordingly, the court found them in contempt, ordered them incarcerated, and stated that they would be released upon: (a) a period of two years, (b) the conclusion of the grand jury investigating the crimes at issue, or (c) at such time as they agreed to testify.

The Supreme Court affirmed the validity of this procedure, noting that "[w]hen the petitioners carry the keys of their prison in their own pockets, the action is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees." 384 U.S. at 368, 86 S.Ct. 1531 (internal citations and quotations omitted). Indeed, the Court, prior to the passage of the Recalcitrant Witness Statute discussed *supra*, went even further, stating:

[w]here contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be *confined until compliance*. The conditional nature of the imprisonment—based entirely upon the contemnor's continued defiance— justifies holding civil contempt proceedings absent the safeguards of indictment and jury....

■ In the final analysis, we simply cannot countenance a situation where a contemnor's insistence on continuing his contumacious conduct inures to his benefit, and we surely do not believe that the Constitution requires such a result. To the contrary, a valid order of civil contempt does not become punitive simply because the contemnor persists in punishing himself. We, therefore, hold that an order of civil contempt will only become punitive if a contemnor is unable to comply with the order, or if the circumstances indicate that a court is maintaining the contempt for an impermissible punitive purpose.

Harris has made the choice to do what he is doing, a choice which thumbs its nose at the District Court's authority. The order of contempt seeks to coerce him into making a different choice—which is precisely the justification for and purpose of civil contempt. Due process is not offended by that order.[11] While we can conceive of circumstances where indefinite detention pursuant to a court's civil contempt authority may be so attenuated from its original, valid purpose as to constitute a due process violation, we see no such violation here.[12] Harris can comply with the order in question at any time and the order will be lifted.

## IV.

We will affirm the February 20, 2008 order of the District Court.

DuBOIS, District Judge, concurring.

I concur in the result reached by the majority, but write separately to address the due process standard applicable in civil contempt cases involving coercive confine-

*Id.* at 370–71, 86 S.Ct. 1531 (internal citations and quotations omitted) (emphasis added).

Ultimately, the contemnors were ordered released because the term of the grand jury had expired. But the Court seemed comfortable in concluding that the confinement could have continued if a successor grand jury had been instituted. *Id.* at 371 n. 8, 86 S.Ct. 1531 ("[T]he sentences of imprisonment may be continued or reimposed if the witnesses adhere to their refusal to testify before a successor grand jury.").

11. Our conclusion is in line with the conclusion of the Court of Appeals to have most recently considered the issue. In *Armstrong v. Guccione*, 470 F.3d 89 (2d Cir.2006), the contemnor was a defendant indicted for securities fraud and charged in various civil proceedings initiated by the SEC. During the course of these actions, he was ordered to turn over various personal and corporate assets and records but refused to do so, invoking the Fifth Amendment. His Fifth Amendment argument was rejected, but he persisted in his refusal to turn over the documents. For over six years, the stubborn contemnor sat in jail. Unable to convince the court that he was incapable of complying with the order, he challenged his confinement on, *inter alia*, due process grounds.

The Second Circuit squarely rejected the contention "that, simply by the nature of its length," a term of civil confinement can offend due process. *Id.* at 110. The majority noted that the "length of coercive incarceration"—over six years in *Armstrong*—"is not dispositive of its lawfulness." *Id.* Indeed, the majority, after noting that the concurring opinion stated that "there is a limit to how long [a person] can be incarcerated," unambiguously stated: "We disagree." *Id.* at 111 n. 9.

The majority did find that a long period of noncompliance might give rise to an inference that a contemnor was incapable of complying. *Id.* at 110–11. But Harris is not arguing—and will never be able to argue—a factual inability to comply. Accordingly, we have no occasion to decide whether an extended period of noncompliance might give rise to a presumption of an inability to comply.

12. Thus, we suggest that the distinguished judge who authored the concurring opinion believes that we say more than we believe we do. We will allow our Opinion to speak for itself.

ment. In my view, such confinement, while indefinite, is not limitless. To the contrary, I am persuaded that when a civil contempt order ceases to have a coercive effect, it loses its remedial purpose and becomes punitive. Under those circumstances, because "it is well established that criminal penalties may not be imposed in civil contempt proceedings," the contemnor must be released and, if deemed appropriate, prosecuted separately for criminal contempt. *In re Grand Jury Investigation (Appeal of Braun)*, 600 F.2d 420, 423–24 (3d Cir.1979). As we held in *Braun*, the burden of establishing that there is "no substantial likelihood" that continued confinement would accomplish its coercive purpose falls to the contemnor. *Id.* at 425 (internal quotations omitted).

In rejecting the existence of due process limitations on the continuation of civil contempt confinement, the majority relies in large part on the reasoning of *Chadwick v. Janecka*, 312 F.3d 597 (3d Cir.2002), and on *Chadwick*'s interpretation of *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), the Supreme Court's most recent decision concerning the differences between civil and criminal contempt. I believe this reliance to be misplaced.

The majority takes *Chadwick*'s lead in focusing on the following language in *Bagwell*:

> The paradigmatic coercive, civil contempt sanction ... involves confining a contemnor *indefinitely until he complies* with an affirmative command such as an order "to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance."

512 U.S. at 828, 114 S.Ct. 2552 (quoting *Gompers v. Bucks Stove & Range Co.*, 221

U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911)) (emphasis added); *Chadwick*, 312 F.3d at 608; Majority Op., *supra*, at 518. In *Chadwick*, we rejected the petitioner's contention that the phrase "indefinitely until he complies" means "indefinitely until he complies or it becomes apparent that he is never going to comply." 312 F.3d at 608. We further described the meaning of the "indefinitely until he complies" phrase as "perfectly clear," concluding that the language "sets the point in time at which confinement must cease." *Id.* Although *Chadwick* seems to construe *Bagwell*'s "until he complies" language as setting the *only* point at which civil contempt confinement must cease, that analysis was not necessary to the holding in *Chadwick*. Moreover, *Chadwick*, itself, recognized a second point at which civil contempt confinement must terminate—when the contemnor proves that he is unable to comply. *Chadwick*, 312 F.3d at 609–11 (analyzing *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948)).

In *Chadwick* we reviewed the contemnor's petition for habeas corpus under the restrictive standard set forth in the Antiterrorism and Effective Death Penalty Act, which precludes federal relief unless the petitioner can prove that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Chadwick*, 312 F.3d at 606–07. Applying that standard, we denied relief to Chadwick on the ground that *Bagwell* did not "clearly establish[ ]" the existence of a due process limitation on civil contempt confinement and that no other Supreme Court case had "endorsed the proposition that confinement for civil contempt must cease when there is 'no substantial likelihood of compliance.' "[13] *Id.* at 608, 613. *Chadwick* ex-

---

**13.** I note that on July 10, 2009, Judge Joseph P. Cronin, Jr., President Judge of the Court of Common Pleas of Delaware County, granted

pressly reserved ruling on whether *Bagwell* undermined *Braun*'s due process holding. *Id.* at 613.

When read in context, the language in *Bagwell* does not mean that civil contempt can continue indefinitely without raising due process concerns. In fact, *Bagwell* neither endorses nor precludes the existence of due process limitations on the continuation of civil contempt confinement because that issue was not before the Court. *Bagwell* dealt with the characterization of a contempt sanction as civil or criminal *at its imposition;* the issue was not the termination of an otherwise lawful coercive contempt sanction. *Bagwell*, 512 U.S. at 823, 114 S.Ct. 2552. Moreover, *Bagwell* addressed the imposition of fines, not incarceration, and discussed coercive incarceration for comparative purposes only. *Id.* at 823, 828, 114 S.Ct. 2552. The *Bagwell* Court had no occasion to consider whether there existed any limitations—due process or otherwise—on the continuation of indefinite civil contempt confinement.

Although the Supreme Court has not considered this issue, the Third Circuit has done so. In *Braun*, we recognized that due process imposes an outer limit, albeit a variable one, on the length of indefinite civil contempt confinement. "Because the contemnor's imprisonment is said to be justified as a coercive measure, [the rule is] that when the confinement has lost its coercive force it essentially becomes punitive, and the contemnor must then be released since it is well established that

criminal penalties may not be imposed in civil contempt proceedings." *Braun*, 600 F.2d at 423–24, 425 (citations omitted). To obtain release, "the contemnor must ... establish[ ] that there is no 'substantial likelihood' that continued confinement would accomplish its coercive purpose." *Id.* at 425. The contemnor's burden is not satisfied where he does no more than "boldly assert[ ] that he will never comply with the court's order" or where his obstinacy "can be rationally attributed to considerations other than an adamant refusal to purge himself of contempt despite the consequences." *Id.* (internal quotation marks omitted).

*Braun* is, as the majority notes, a recalcitrant witness case, which was governed by the eighteen-month limit on civil contempt confinement provided in the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a). For this reason, the majority states that the due process holding on which I rely is dicta. I disagree with that conclusion. The analysis in *Braun* clearly has three parts, all of which are necessary to the holding in that case. First, we stated the due process standard—that civil contempt confinement must terminate when it loses the remedial coercive effect that justified its imposition. *Id.* at 423–25. We observed, however, that applying the standard in practice was a "perplexing task" because "the point at which coercive imprisonment actually ceases to be coercive and essentially becomes punitive is not readily discernible." Id. at 425. For that

H. Beatty Chadwick's most recent petition for writ of habeas corpus and released him after more than fourteen years of civil contempt confinement. In an opinion issued that date, Judge Cronin found, based on the record in the case and the evidence presented at a hearing on July 7, 2009, that Chadwick had the present ability to comply with the underlying order which required him to deposit approximately 2.5 million dollars in an escrow account under the jurisdiction of the court.

Judge Cronin nevertheless released Chadwick, concluding that Chadwick's continued refusal to comply with the contempt order despite fourteen years of incarceration "demonstrates that the [contempt order] ... has lost its present coercive effect and that it is unlikely that the continued incarceration of Petitioner Chadwick will result in his compliance with [that order]." *Chadwick v. Green,* Civ. No. 09–2134 (Del. County Ct. Com. Pl. July 10, 2009).

reason, we ruled that it was appropriate for the contemnor to bear the burden of establishing that there was no substantial likelihood that continued confinement would accomplish its coercive purpose. *Id.*

In the next part of the opinion, we discussed the relevance of the eighteen-month limit imposed by the Recalcitrant Witness Statute and determined that "Congress has, in effect, addressed essentially the same problem that courts must tackle under a due process analysis, and has thereby filled the void that existed under prior practice, where there was a possibility that unconscionable, indeterminate periods of confinement might be imposed for civil contempt." *Id.* at 427. We held that this legislative determination regarding the point at which the continued confinement of recalcitrant witnesses becomes punitive must be accorded substantial deference. *Id.* We did not, however, exempt recalcitrant witnesses from due process protection. Instead, we specifically stated that "a court may not abdicate its responsibilities under the Constitution simply because Congress has legislated in a particular area." *Id.*

In the final part of the opinion, and in accordance with the pronouncement that a court may not abdicate its responsibilities under the Constitution, we considered the merits of Braun's due process challenge to his continued incarceration. The ultimate holding in *Braun* was that "Braun ha[d] not alleged any facts that would warrant a departure, at least at [that] time, from the eighteen-month benchmark laid down by Congress." *Id.* at 427. In other words, we applied the due process standard to the facts presented and concluded that Braun had not met his "heavy" burden of establishing that his continued confinement had "no substantial likelihood" of coercing his testimony. *Id.* at 425, 427–28. For this reason, I do not believe *Braun's* due process holding to be dicta.

The due process standard articulated and applied in *Braun* has not been overruled by the Third Circuit sitting *en banc,* and there is no basis for arguing that the Supreme Court abrogated the standard in *Bagwell.* In civil contempt cases not covered by the Recalcitrant Witness Statute, such as this one, due process is the only existing limitation on the continuation of "unconscionable, indeterminate periods of confinement," *id.* at 427, and there is no reason to deny due process protection to a civil contemnor merely because he "carries the keys of his prison in his own pocket."

There remains the troubling prospect of permitting "a contemnor's insistence on continuing his contumacious conduct [to] inure[ ] to his benefit." Majority Op., *supra,* at 520. I firmly agree with the majority that an individual should not be allowed to "thumb its nose" at the district court's authority. *Id.* However, civil contempt confinement may not be continued indefinitely on that ground alone. The purpose of civil contempt is remedial; vindicating the authority of the court is a punitive interest that falls primarily within the ambit of criminal contempt. *Bagwell,* 512 U.S. at 827–28, 114 S.Ct. 2552; *Yates v. United States,* 355 U.S. 66, 72, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); *Gompers,* 221 U.S. at 441–42, 31 S.Ct. 492. Moreover, any termination of Harris's civil contempt confinement does not limit the District Court's ability to vindicate its authority through criminal contempt proceedings. *See Yates,* 355 U.S. at 74–75, 78 S.Ct. 128; *Penfield Co. of Cal. v. SEC,* 330 U.S. 585, 594, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); *United States v. United Mine Workers of Am.,* 330 U.S. 258, 298–300, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Thus, although the court has a legitimate interest in vindicating its authority, I do not view that interest to be a proper independent basis for continuing civil contempt confinement

where the confinement has lost its remedial coercive effect.

Applying the due process standard in this case does not lead to a different result than that reached by the majority because Harris did not carry his burden of establishing that there was no substantial likelihood that continued confinement would accomplish its coercive purpose. Harris relied solely on the length of his confinement—almost four years when the District Court ruled on Harris's motion to terminate his contempt—to demonstrate the futility of further confinement.[14] (App.175.) While the length of a contemnor's confinement is relevant for determining its ongoing coercive effect, it is not dispositive. *Braun,* 600 F.2d at 425 & n. 17, 428 (citing *Catena v. Seidl,* 65 N.J. 257, 321 A.2d 225 (1974)). Further, the applicable standard of review in such cases is highly deferential. *See Simkin v. United States,* 715 F.2d 34, 38 (2d Cir. 1983) (holding that a district court has "virtually unreviewable discretion" in deciding "whether a civil contempt sanction has lost any realistic possibility of having a coercive effect"). On the present state of the record, there is no basis for concluding that the District Court abused its discretion in deciding to continue Harris's civil contempt confinement.

Although the majority and I reach the same result, I am concerned that the majority goes too far—it completely shuts the due process door to a person confined for civil contempt merely because he "carries the keys of his prison in his own pocket." In my view, the better approach, and the approach mandated by our precedential opinion in *Braun,* is to leave the due process door open and to rely on the sound judgment of district courts in determining whether, in a particular case, civil con-

tempt confinement continues to have a coercive effect. The fact that a contemnor possesses the keys to his own jail cell justifies the imposition of an indefinite civil contempt sentence, but it does not justify life-long confinement.

---

14. On this issue, although there is evidence in the record concerning Harris's beliefs, his mental state, and his attacks on the jurisdiction of the District Court, that evidence was not presented to establish the improbability of future compliance.