NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-4190
_____

REGINALD DAVID LUNDY,
                                        Appellant

v.

JOHN YOST

_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 07-cv-4180
(Honorable Jerome B. Simandle)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 4, 2010

Before:  SCIRICA, FUENTES and JORDAN, *Circuit Judges*.

(Filed: January 4, 2011)
_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

        Reginald Lundy appeals the District Court's denial of his motion to vacate an

order of civil contempt under which he is incarcerated.  The order of civil contempt

resulted from Lundy's continued refusal to cease violating a court order that he desist from filing false and harassing documents purporting to establish judgments and lien claims against the court, United States attorneys, defense attorneys, and other personnel affiliated with the court. The order was entered in an underlying criminal proceeding in which he was convicted of conspiracy to produce and pass, and of possessing and passing, fraudulent financial documents represented as issued by agencies of the United States, and sentenced to 120 months of imprisonment. But Lundy's criminal sentence, set to run consecutively to confinement under the civil contempt order, has yet to begin because Lundy continues to engage in contemptuous conduct and so has been imprisoned under the order of civil contempt since June 7, 2004. We will affirm.

I.

The facts of the underlying criminal case and contemptuous conduct are well-known to the parties and well-documented in various district court opinions, *see, e.g.*, *United States v. Harris*, 332 F. Supp. 2d 692, 694 & 694 n.1 (D.N.J. 2004), and in a related case involving Lundy's co-conspirator and co-contemnor's appeal, *see United States v. Harris*, 582 F.3d 512 (3d Cir. 2009) (affirming denial of motion to vacate order of civil contempt). Defendants in the underlying case purport to be members of an organization called the Al-Moroccan Empire or Moors, and claim to believe they are sovereigns of an empire that predates the United States, to which the United States owes rent money for the use of land, and because of which the United States cannot subject defendants to its criminal laws. *Harris*, 332 F. Supp. 2d at 694. Defendants printed

money orders, purporting to draw from accounts at the United States Department of Transportation or Department of the Treasury, which defendants used to pay outstanding loans and other expenses. On May 6, 2003, Lundy was charged with conspiracy to produce and pass false and fictitious money orders, and with possessing or passing, with the intent to defraud, fictitious securities or other financial instruments represented as authorized by the United States Department of Transportation and the United States Department of the Treasury, in violation of, respectively, 18 U.S.C. § 371 and 18 U.S.C. § 514(a).

After the indictment, Lundy and other of the defendants began to harass the court and prosecutors by sending, among other things, fraudulent financial security arrangements, contracts, and lien claims. On August 27, 2003, the court entered an order enjoining Lundy and other co-defendants from "sending any written communications to this Court, to any judicial officer or employee of this Court, to the United States Attorney, to any Assistant United States Attorney, to any employee or officer of the United States Department of Justice, or to any attorney appearing in this case, whether in an official or allegedly 'private' capacity . . . [w]hich attempts to create a lien or financial interest; or . . . [w]hich purports to state a contract with such recipient regarding any civil or commercial matter," and from "creating affidavits of debt or UCC Financing Statements . . . based upon the above-described security agreements or contracts or liens however entitled." Lundy continued to send bogus financial documents and the Court issued an order of contempt on June 7, 2004, finding Lundy in civil contempt of the

August 27, 2003, injunction. Under the contempt order, Lundy was to be confined until he purged his contempt by, among other things, ceasing to send such documents to the court and others associated with the case, and by renouncing any future intent to recommence.

Lundy was jointly tried and, on July 2, 2004, convicted with codefendants William Oscar Harris, Reginald Wooten, Arthur Outterbridge, and Robert McCurdy. On October 29, 2004, Lundy was sentenced to a total term of 120 months imprisonment, set to run consecutively to his confinement under the civil contempt order of June 7, 2004. (District Court *3.) Lundy and his co-defendants appealed, and the Third Circuit affirmed the judgments of sentence, *see United States v. Harris*, 271 F. App'x 188, 190 (3d Cir. 2008) (finding "each of the issues raised by appellants is without merit"), and denied Lundy's petition for rehearing *en banc*. Despite the conclusion of Lundy's criminal case, because Lundy has continued to mail fraudulent financial demands, contracts, and claims, he remains imprisoned under the contempt order, tolling the running of his criminal sentence.

Lundy filed a motion to vacate the court's contempt order on August 31, 2007. Lundy argued that the enactment of a federal criminal statute, 18 U.S.C. § 1521,[1]

---

[1] Section 1521, entitled "Retaliating against a Federal judge or Federal law enforcement officer by false claim or slander of title," provides:

> Whoever files, attempts to file, or conspires to file, in any public record or in any private record which is generally available to the public, any false lien or encumbrance against the real or personal property of an individual described in

4

criminalizing the filing or attempted filing in any public record of false lien claims against "any officer or employee of the United States or of any agency in any branch of the United States Government"—certain of the conduct for which Lundy is being held in contempt—removed any justification for the contempt order because if the "statute itself does not deter Mr. Lundy's mailings, then prosecution under section 1521 would more effectively and more appropriately target Mr. Lundy's conduct than would the Contempt Order." In reply, the government argued that Lundy's persistent and "knowing defiance of the Court's orders should not be rewarded through the dissolution of the Contempt Order simply because [Lundy's] contumacious behavior is persistent." Furthermore, the government contended that the conclusion of Lundy's criminal case had not eliminated the need for the contempt order, which was entered for "general law enforcement purposes," and not for "evidentiary, trial-related or other purposes tied to the pendency of the proceeding."

The District Court's findings of fact included that Lundy (1) possessed the competency to understand the nature of and bring himself into compliance with the order of contempt; (2) had not purged himself of his contempt by ceasing to send false and

---

section 1114, on account of the performance of official duties by that individual, knowing or having reason to know that such lien or encumbrance is false or contains any materially false, fictitious, or fraudulent statement or representation, shall be fined under this title or imprisoned for not more than 10 years, or both.

18 U.S.C. § 1521. Section 1114 reads: "[A]ny officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) . . . ." 18 U.S.C. § 1114.

fraudulent financial demands, contracts and claims, and had indicated he did not intend to cease; (3) had not been deterred by 18 U.S.C. § 1521 from mailing financially threatening documents; and (4) had been able to subvert whatever measures the Bureau of Prisons had in place to prevent such abuses of the mail system.

The District Court reasoned "the Contempt Order adjudged [Lundy] to be in *civil* contempt, and imposed the coercive sanction of imprisonment not to punish [Lundy's] past noncompliance with the Court's orders, but to compel future compliance." Although such orders "ordinarily abate when the proceedings out of which they arise are terminated," *United States v. Slaughter*, 900 F.2d 1119, 1125 (7th Cir. 1990), the District Court concluded the sustained application of the contempt order was warranted because Lundy was still engaged in related proceedings before the court.[2]

II.[3]

---

[2] Lundy filed a § 2255 petition challenging his criminal conviction.

[3] The District Court had jurisdiction under 18 U.S.C. §§ 401 and 3231. "Although now codified at 18 U.S.C. § 401 … the contempt power is rooted principally in the inherent power of the judiciary." *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 563 n.8 (3d Cir. 1985); *see also Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1994) ("Nor do … formal rules and legislative dictates exhaust district courts' power to control misbehaving litigants. To the contrary, the Supreme Court recently reaffirmed that a district court has inherent authority to impose sanctions upon those who would abuse the judicial process.") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991)) . We have jurisdiction under 28 U.S.C. § 1291. "We review a district court's decision on a motion for contempt for abuse of discretion." *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009) (citing *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d. Cir. 1995)). "We review the Court's legal conclusions *de novo*, and will reverse 'only where the decision is based on an error of law or a finding of fact that is clearly erroneous.'" *United States v. Harris*, 582 F.3d 512, 514 (3d Cir. 2009) (quoting *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009)).

On appeal, Lundy argues certain of the conduct covered by his order of civil contempt has been made criminal, that the statute criminalizing the conduct applies "retroactively to the date the contempt order was first imposed," and that the order of civil contempt must therefore be dissolved and Lundy should receive credit towards his criminal sentence in the amount served under the contempt order. Specifically, Lundy claims that under *Teague v. Lane*, 489 U.S. 288 (1989), 18 U.S.C. § 1521, enacted while his appeal in the underlying criminal matter was pending and proscribing certain of the conduct covered by the civil contempt order, applies retroactively to require the dissolution of his civil contempt sanction "based upon a violation of the due process standards applicable to criminal contempt proceedings under 18 U.S.C. [§] 1521."[4]

---

[4] Lundy states the order of "civil contempt undermines Lundy's due process rights as it is clear by the number of documents filed by Lundy that he is never going to comply and civil contempt can continue indefinitely . . . ." We reject Lundy's contention that due process "places a temporal limitation on the amount of time for which a civil contemnor can be confined, regardless of the validity of the underlying order on the merits and the contemnor's ability to comply with that order." *United States v. Harris*, 582 F.3d 512, 516 (3d Cir. 2009). Lundy does not challenge the order on the merits or dispute his ability to comply with the order. In a factually analogous case, we have previously held:

> We cannot conclude that an order such as the one at issue here could ever lose all of its coercive effect. After all, the order requires [appellant] to simply stop what he is doing, with the District Court indicating that a period of *inaction* is all that is needed for it to lift the contempt. Considering the benefit to be gained by [appellant] in complying with the Court's order-to wit, the lifting of the contempt and the commencement of the underlying sentence-we do not believe that the circumstances of this case present any constitutional problem. . . . [W]e simply cannot countenance a situation where a contemnor's insistence on continuing his contumacious conduct inures to his benefit, and we surely do not believe that the Constitution requires such a result. To the contrary, a valid order of civil contempt does not become punitive simply because the contemnor persists in punishing

Lundy contends "retroactive application of 18 U.S.C. § 1521 is required" since his case "was not final when 18 U.S.C. § 1521 was enacted" and accordingly "[t]his Court [s]hould [g]ive [f]ull [r]etroactive [e]ffect [t]o [him] under *Teague v. Lane*." Below, Lundy had argued "not only that the Court should vacate the Contempt Order, but that it should allow [him] credit for 'time served retroactively and coterminous from the date of arrest in the within matter.'" The District Court dismissed Lundy's reading of *Teague* to require the retroactive application of new criminal statutes including 18 U.S.C. § 1521 as "misguided" and "unpersuasive, to say the least." *Teague*, the District Court reasoned, instead "pertains to the retroactive application in collateral proceedings of newly announced 'watershed rules of criminal procedure.'"

*Teague* involved the retroactive application, on collateral review of a conviction, of a "new constitutional rule of criminal procedure" recognized after the conviction at issue became final on direct appeal. *Teague*, 489 U.S. at 299. In *Teague*, a plurality of the Supreme Court held that only new constitutional rules prohibiting the criminalization of certain kinds of private conduct, or "watershed rules of criminal procedure" essential to the reliable adjudication of criminal charges, could be applied retroactively. *Id*. at 311. Here, by contrast, Lundy seeks the exclusive and retroactive application, on direct appeal

himself. We, therefore, hold that an order of civil contempt will only become punitive if a contemnor is unable to comply with the order, or if the circumstances indicate that a court is maintaining the contempt for an impermissible punitive purpose."

*Harris*, 582 F.3d at 519-20.

8

from denial of a motion to vacate an order of civil contempt, of a federal statute criminalizing certain conduct. Accordingly, Lundy does not seek the protection, on collateral review of a conviction, of a judicially recognized rule "requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." *Beard v. Banks*, 542 U.S. 406, 417, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (internal quotation marks and citation omitted). We agree with the District Court that *Teague* is inapposite.

Furthermore, Lundy's argument presupposes that in circumstances in which conduct covered by an order of civil contempt has been made criminal, the contumacious conduct may no longer be subject to a court's civil contempt power, but must instead be punished through a criminal prosecution. We reject the premise. According to Lundy, because certain of his conduct has been criminalized by 18 U.S.C. § 1521, if he should continue to engage in contumacious behavior he should be prosecuted under the criminal statute, and the order of civil contempt must necessarily be dissolved "based upon a violation of the due process standards applicable to criminal contempt proceedings under 18 U.S.C. [§] 1521." But the mere availability of criminal sanctions for certain conduct does not restrict a court's authority to hold a person in civil contempt for the same conduct. *Cf. Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 896 (3d Cir. 1992) (describing "well-established practice of imposing both civil and criminal contempt for the same conduct"); *United States v. Petito*, 671 F.2d 68, 72 (2d Cir. 1982). Indeed, "[w]hen a party refuses to obey a court order … civil sanctions may be used to coerce

9

compliance and criminal sanctions to punish the disobedient conduct." *Taberer,* 954 F.2d at 896.

Instead, a court's authority to hold a person in civil contempt turns largely on the purpose of the contempt order. "There are two types of contempt, civil and criminal, and it is not always easy to distinguish between them: as the Supreme Court has observed, the distinction is 'somewhat elusive.'" *United States v. Harris*, 582 F.3d 512 (3d Cir. 2009) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 830, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994)). "[T]he key distinction between civil and criminal contempt lies in the court's purpose. Civil contempt sanctions are intended to coerce or to compensate; criminal contempt sanctions to punish." *Taberer*, 954 F.2d 888 at 896. Civil contempt sanctions may be imposed without affording the accused contemnor the kinds of procedural protections associated with due process in the criminal context. "Rather, civil contempt is imposed by the judge upon a finding that one has failed to comply with a valid court order. . . ." *Harris*, 582 F.3d at 515; *see also Shillitani v. United States*, 384 U.S. 364, 371 ("The conditional nature of the imprisonment—based entirely upon the contemnor's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury . . . ." (citation omitted)). "A person subject to criminal contempt is entitled to greater procedural protections than a person subject to civil contempt: most importantly, the purported contemnor has a right to trial by jury." *Harris*, 582 F.3d at 515.

We agree with the District Court that the contempt order was designed to coerce, not punish. "The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command . . . . [T]he contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket.'" *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, S.Ct. 2552, 129 L.Ed.2d 642 (1994); *see also Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990) ("[T]he contempt proceeding is civil if the defendant stands committed unless and until he performs the affirmative act required by the court's order." (internal quotation marks and citation omitted)). The contempt order makes clear that the purpose of imposing the sanction of imprisonment was to induce compliance with the court's order of August 27, 2003, not to punish Lundy for refusing to abide by the prior order. The order stated that incarceration "shall cease immediately" upon Lundy "purg[ing] himself of his contempt . . . ." "[U]nder the terms of the Contempt Order, [Lundy] is to be confined until, and only until, he withdraws his fraudulent mailings and renounces his intent to mail such documents to specified individuals in the future." Lundy, an imprisoned contemnor competent to understand and capable of complying with the contempt order, "carries the keys of his prison in his own pocket." *Operation Rescue*, 919 F.2d at 868 (internal quotation marks and citation omitted).[5]

---

[5] Furthermore, "recognize[ing] that the upshot of Mr. Lundy's active contumacy is that he has yet to begin serving his 120-month sentence, because that sentence is to be served

III.

The District Court did not abuse its discretion in refusing to vacate the order of civil contempt and finding that Lundy's incarceration should continue. For the foregoing reasons, we will affirm the District Court's denial of Lundy's application to vacate the contempt order.

---

consecutive to his civil contempt confinement," the District Court took care to evaluate whether there are adequate substitutes for the contempt order "that would achieve the same purpose while enabling Mr. Lundy to serve the sentence imposed for the crimes for which he was convicted . . . ." Among other things, the Court considered whether the order should be vacated because the government could now determine whether or not to prosecute Lundy's conduct under 18 U.S.C. § 1521. The Court noted that the scope of § 1521 and the Court's August, 27, 2003, order are not coterminous. The former prohibits only the filing of false lien claims against U.S. employees; the latter prohibits a broader range of conduct including the sending of written communications purporting to state a contract regarding any civil or commercial matter or from creating affidavits of debt or UCC Financing Statements based on them. Additionally, the Court's order identifies a broader recipient class to which Lundy was enjoined from sending such communications than § 1521, which includes only U.S. employees. Finally, the Court concluded the prospect of prosecution under § 1521 was not a sufficient alternative because "[e]ven if Mr. Lundy were to be prosecuted under section 1521, it would be a considerable amount of time before such a prosecution could be completed, whereas the Contempt Order is already in place," and the results of such prosecutions are uncertain.

12